JOHN T. BELK ARCE, demandante y recurrido, *v.* FRED H. MARTÍNEZ y OTROS, demandantes contra terceros y recurrentes; RALPH V. SIERRA, JR. y MARGARITA SERAPIÓN, terceros demandados y recurridos.

*Número:* RE-95-51 *Resuelto:* 30 de junio de 1998

*Peter Ortiz,* abogado de la parte recurrente; *Judith Berkan, Rosalinda Pesquera* y *Mary Jo Méndez,* abogadas de la

parte demandante recurrida; *Keith A. Graffam*, abogado de los terceros demandados y recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Durante 1986, el Lcdo. John T. Belk Arce[1] fue contratado por el bufete de abogados Martínez, Odell, Calabria y Sierra (en adelante MOCS)[2] para ocupar un puesto como abogado asociado en su Departamento de Contribuciones.[3] A base de su desempeño y ejecutorias, al cabo de dos (2) años Belk fue promovido a *Senior Associate* y, en 1990, a *Junior Partner*. Con cada ascenso se le concedió un aumento en salario y bonificaciones. Ambos ascensos fueron aprobados unánimemente por los socios propietarios y su labor siempre fue caracterizada como de excelencia. En su última evaluación, Belk fue calificado como el *mejor* de los nueve (9) *junior partners* de la firma. Dicha evaluación reveló, a su vez, que poseía el segundo mejor porcentaje de productividad en su grupo.[4] Mantuvo siempre buenas relaciones personales y profesionales con los demás empleados y sus servicios eran utilizados constantemente por otros departamentos.

---

[1] Egresado del Columbia College y de la Facultad de Derecho de la Universidad de Puerto Rico. Posee una maestría en derecho tributario de Boston University, siendo el único abogado con esa preparación académica en la firma. Antes de comenzar en el bufete de abogados Martínez, Odell, Calabria y Sierra (en adelante MOCS), laboró por el espacio de seis (6) años en el Departamento de Hacienda. Allí dirigió la Oficina de Inteligencia y, posteriormente, fue ascendido al puesto de Subsecretario Auxiliar de Rentas Internas y Recaudaciones.

[2] El Bufete Martínez, Odell y Calabria tiene sus orígenes en el anterior Bufete Colorado, Martínez y Odell formado en 1979. En su primer año de existencia se unieron como socios propietarios los Lcdos. José L. Calabria y Ralph Sierra. Posteriormente, el Lcdo. Antonio Colorado renunció para asumir un puesto público, quedando como únicos socios los licenciados Martínez, Odell, Calabria y Sierra.

[3] Los hechos aquí relatados surgen de las determinaciones de hecho efectuadas por el Tribunal de Primera Instancia y de nuestro examen de la prueba testifical y documental presentada en el juicio.

[4] Véase *Summary of Junior Partners Evaluation*, noviembre de 1991, *Exhibit* 1 del demandante.

Durante el tiempo que trabajó en la firma, Belk desarrolló una relación cordial de trabajo con los socios propietarios, licenciados Martínez, Odell y Calabria, quienes constantemente requerían sus servicios. En general, los socios confiaban en su labor y no tenían comentarios negativos sobre su desempeño.[5]

El 5 de mayo de 1989 Belk contrajo matrimonio con la Lcda. Margarita Serapión, quién también se desempeñaba como abogada en el Departamento de Contribuciones de la firma. Ninguno de los socios ni de los empleados del bufete MOCS fueron invitados a la ceremonia. De hecho, la pareja optó por no informar a nadie sobre el matrimonio, pues Belk temía que si los socios se enteraban de su matrimonio con Serapión sería despedido. A su juicio, existían actitudes discriminatorias en ese sentido por parte de los socios Martínez, Odell y Calabria, por lo cual temía perder su trabajo.[6]

En ese entonces, el bufete no poseía un manual de empleados que aplicara a sus abogados ni existía norma alguna que prohibiera los matrimonios entre miembros de la firma. El contrato de sociedad tampoco contenía una prohibición a esos efectos. Nunca se les comunicó a los abogados sobre la existencia de alguna prohibición *no escrita* a este respecto.

Durante 1990, Serapión fue ascendida a socia propietaria, con un interés equivalente de cuatro por ciento (4%). A pesar de su posición y de trabajar en el mismo departamento que su esposo, nunca lo supervisó, pues esta tarea

---

[5] La prueba demostró que las actitudes de los socios Martínez, Odell y Calabria hacia el Lcdo. John T. Belk Arce denotaban una gran confianza en las habilidades y los conocimientos de éste como abogado. Ejemplo de ello es que el licenciado Calabria solicitaba los servicios de Belk en asuntos contributivos que requerían atención rápida. De otra parte, Odell en una ocasión trató de reclutar a Belk para que trabajara en el Departamento de *Corporate Finance*. Por su parte, Martínez invitó a Belk a unirse a un bufete que estaba considerando formar para que dirigiera el Departamento de Contribuciones.

[6] Según Belk, este temor estaba fundado en el hecho de que anteriormente había escuchado a los socios de MOCS hacer comentarios contra la Lcda. Delia Colorado, debido a su relación de esposa con el entonces socio Antonio Colorado.

recaía en el Lcdo. Ralph Sierra, Supervisor del Departamento de Contribuciones.

Debido a rumores sobre el matrimonio entre los licenciados Belk y Serapión, en marzo de 1990 el licenciado Martínez sostuvo una conversación con el ex esposo de Serapión, Ismael Rodríguez Poggi. Éste le informó que Serapión y Belk se habían casado. Martínez notificó de este hecho a Odell, sin embargo ninguno actuó sobre el asunto.(7)

Así las cosas, entre 1991 y los primeros meses de 1992 surgieron diferencias entre los cinco (5) socios propietarios que componían el Comité Ejecutivo del bufete.(8) Estas diferencias consistían en asuntos referentes al ingreso de nuevos socios, una transición ordenada para cuando el licenciado Calabria se acogiera al retiro y el cambio de clasificación de Serapión, pues a ésta le restaban unos meses para convertirse en *senior partner*, con los mismos derechos que ostentaban los otros socios. Durante el período en que ocurrieron estas diferencias, Martínez y Odell comenzaron a hacer indagaciones con el propósito de confirmar la información que habían recibido de Rodríguez Poggi, casi dos (2) años antes, relacionada con la relación marital entre Belk y Serapión.(9)

Posteriormente, los socios —Martínez, Odell y Calabria— propusieron unos cambios al acuerdo de sociedad, y este último preparó una nueva propuesta a esos efectos.(10)

---

(7) Poco después de la conversación entre Martínez y Rodríguez Poggi, Belk fue ascendido a *junior partner*. El expediente carece de prueba sobre si la relación de Belk con Serapión fue objeto de discusión al tomar esta decisión.

(8) Estos eran los licenciados Martínez, Odell, Calabria, Sierra y la licenciada Serapión.

(9) En febrero de 1992 Martínez le preguntó a la secretaria de Belk, Ingrid Johnson, sobre el posible matrimonio de Belk y Serapión. Posteriormente, en marzo de ese año, Martínez y Odell se reunieron con un abogado del bufete, el licenciado Castellanos, para también inquirir sobre la relación entre ambos abogados.

(10) Es menester señalar que el 30 de marzo de 1992, mientras ocurrían las disputas entre los socios del bufete, el licenciado Calabria circuló un borrador de propuesta de nuevo acuerdo de sociedad a los *senior partners* de MOCS. La Sec. 13.03 de dicha propuesta disponía:

Los socios Sierra y Serapión rechazaron la propuesta sometida por ser perjudicial a los intereses de ella. Tras un *impasse* en las negociaciones, los socios tomaron la decisión de contratar a la firma de consultores Hildebrandt para buscar soluciones a sus diferencias.

La firma de consultores envió a Howard Mudrick a reunirse con los socios. Durante una de las reuniones con Martínez, Mudrick tomó la nota siguiente de manera contemporánea:

> There is a genuine level of mistrust of Margarita [Serapión] issues of dishonest
> 1. *Marriage w / Belk*
> 2. Her bldg equit at level 4% (Énfasis suplido.)

En abril de 1992 los socios Martínez, Odell y Calabria emitieron un ultimátum a los licenciados Sierra y Serapión: aceptar las enmiendas propuestas al contrato de sociedad o se entendería disuelta. Ambos rechazaron el dictamen y exigieron poner en vigor la cláusula de arbitraje, conforme lo establecía el contrato de sociedad vigente.

El 1ro de mayo los socios —Martínez, Odell y Calabria— decidieron disolver el bufete MOCS haciendo retroactivo al 30 de abril dicha determinación. Ese mismo día formaron una nueva sociedad bajo el nombre de bufete Martínez, Odell y Calabria (en adelante MOC). *El nuevo bufete ocupó la misma planta física, retuvo a la mayoría de los empleados que laboraban en MOCS y mantuvo intacta la organización de departamentos con los mismos jefes, excepto en el Departamento de Contribuciones.*

Se notificó a los licenciados Sierra y Serapión de la disolución el 1ro de mayo, y ese mismo día se les informó que

---

"Subject to the provisions of applicable law, the Firm will exercise its discretion in its best interest when hiring lawyers, towards avoiding having married lawyer couples or who are living together consensually. The discovery of such situation affecting any two lawyers in the Firm shall be cause for the establishment of special rules at the discretion of the Executive Committee in accordance with applicable law, to insure that the best interests of the Firm are not adversely affected by the existence of such situation." Draft of Proposed New Partnership Agreement, *Exhibit* 11 de la parte demandante.

no formarían parte del nuevo bufete. Por su parte, Belk trabajó ese día en el nuevo bufete sin saber de los cambios ocurridos. Sin embargo, al día siguiente encontró guardias de seguridad en las puertas. Sus expedientes y otras herramientas de trabajo fueron incautados. En la tarde, los socios (Martínez, Odell y Calabria) se reunieron con él y la Lcda. Magali Cobián, también abogada en el Departamento de Contribuciones. Martínez le preguntó a Belk dónde estaba residiendo actualmente, a lo cual éste contestó de manera evasiva para no revelar su estado civil. Inmediatamente, los socios le informaron a Belk y a Cobián que no serían empleados del nuevo bufete.

Transcurridas dos (2) semanas de la disolución del bufete MOCS, los licenciados Sierra y Odell sostuvieron una conversación sobre la posibilidad de que los abogados despedidos fueran reinstalados dentro del nuevo bufete. Odell expresó su interés en que Sierra y Cobián regresaran a la firma; sin embargo, señaló que no podía aceptar a Belk y a Serapión *porque estaban casados entre sí.*

El 24 de junio de 1992 Belk instó una demanda por discrimen en el empleo por razón de matrimonio, al amparo de la Constitución del E.L.A. y de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146 *et seq.*; despido injustificado al amparo de la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a–185m), y una acción por daños y perjuicios contra los licenciados Martínez, Odell y Calabria, y la sociedad MOC compuesta por ellos.[11]

Alegó, en síntesis, que la sociedad profesional MOC era patrono sucesor del bufete MOCS. Adujo que el 2 de mayo de 1992 los socios Martínez, Odell y Calabria, actuando como representantes de MOC, lo despidieron por razón de su matrimonio con la licenciada Serapión y que dicha actuación constituía un despido injustificado y discriminatorio.

---

[11] Belk no solicitó ser restituido en el empleo.

El bufete MOC contestó la demanda. Negó todas las alegaciones y adujo que la razón para no invitar a Belk a pertenecer al nuevo bufete se debió a que los socios no le tenían confianza. A su vez, presentaron una demanda contra tercero contra los licenciados Sierra y Serapión. Alegaron que, de prevalecer el demandante en su reclamación al amparo de la Ley Núm. 80, *supra,* éstos, como parte del bufete MOCS —patrono anterior— responderían por los daños concedidos.

Celebrado el juicio en su fondo, el Tribunal de Primera Instancia, Sala de San Juan (Hon. Antonio L. Corretjer Piquer, Juez), falló en favor de Belk y resolvió que el nuevo bufete MOC le había violado sus derechos constitucionales y estatutarios.[12] A su vez, declaró sin lugar la demanda contra terceros. Inconformes, los demandados acudieron ante nos.[13]

---

[12] En su sentencia ordenó a los demandados a satisfacer a Belk la cantidad de cincuenta y nueve mil cuatrocientos setenta y cuatro dólares con treinta y cuatro centavos ($59,474.34) por lucro cesante al amparo de la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*) y de nuestra Constitución, más una suma igual por penalidad según la citada Ley Núm. 100, para un total de ciento dieciocho mil novecientos cuarenta y ocho dólares con sesenta y ocho centavos ($118,948.68). Por sufrimientos y angustias mentales por violación a la Ley Núm. 100, *supra,* y a la Constitución, concedió quince mil dólares ($15,000), más una suma igual por penalidad según la Ley Núm. 100, *supra,* lo que asciende a treinta mil dólares ($30,000). Concedió cinco mil dólares ($5,000) por honorarios de abogado al amparo de dichas leyes. Además, le otorgó la cantidad de diecinueve mil trescientos veinticuatro dólares con cuarentaisiete centavos ($19,324.47) en concepto de mesada, según la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a–185m), más dos mil dólares ($2,000) por honorarios de abogado.

Como sanción a la temeridad desplegada por los demandados, en relación con la controversia sobre patrono estatutario, impuso dos mil dólares ($2,000) en concepto de honorarios de abogado, las costas y los intereses legales.

[13] Nos hacen los señalamientos de error siguientes:

"Si erró el Tribunal al determinar que en este caso hay un gran cúmulo de prueba indirecta y circunstancial que demuestra, que si no fuera por el matrimonio entre Belk y Margarita Serapión y/o la relación íntima entre ellos, no hubieran sido despedidos.

"Si el Tribunal incidió, al descartar los testimonios de los demandados Martínez y Odell, los cuales, lejos de ser controvertidos, fueron corroborados o confirmados por el propio Belk y la abundante prueba testifical y documental de ambas partes.

"Si el Tribunal interpretó y aplicó correctamente a los hechos del caso las normas sobre presunción de discrimen y el peso de la prueba.

## II

Los tres (3) primeros señalamientos de error están dirigidos a la apreciación de la prueba y a la aplicación, alegadamente incorrecta, de las normas evidenciarias sobre las presunciones y el peso de la prueba en casos de discrimen en el empleo. La naturaleza de los planteamientos del demandado MOC requiere que expongamos con brevedad el trasfondo constitucional, jurídico y evidenciario aplicables.

"Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y *a su vida privada o familiar.*" (Énfasis suplido.) Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 301. Anteriormente hemos reconocido que el derecho a la intimidad opera *ex propio vigore* y puede hacerse valer entre personas privadas; no necesariamente requiere acción por parte del Estado. *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975); *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964); *González v. Ramírez Cuerda*, 88 D.P.R. 125 (1963). No cabe duda que la Ley Núm. 100, *supra*, tiene como propósito proteger el derecho a la intimidad de los empleados y expresamente cubre el discrimen que es objeto de esta controversia.

También existe una clara política pública en favor de la protección y el fortalecimiento de la familia. El matrimonio, como institución básica, contribuye como nin-

---

"Si en este caso las reclamaciones bajo las Leyes Núm. 100 y 80 son mutuamente excluyentes.

. . . . . . . .

"Si las compensaciones concedidas son excesivas.

. . . . . . . .

"Si los demandados fueron temerarios, a los fines de imponer honorarios de abogado." Solicitud de revisión, pág. 10.

guna otra al robustecimiento y vitalidad de la familia, componente medular de nuestra sociedad.[14]

▮▮▮ Ciertamente, en determinadas situaciones el derecho de la propiedad del patrono cede ante el derecho a la intimidad del empleado. *Arroyo v. Rattan Specialties, Inc.*, supra. Este derecho, en su modalidad de autonomía en la toma de decisiones sobre la vida íntima o familiar, indudablemente incluye el derecho del individuo a contraer matrimonio sin que medie la intervención indebida del Estado o de personas particulares. Este derecho no puede estar supeditado a factores externos que impidan sustancialmente su libre ejercicio. *Figueroa Ferrer v. E.L.A.*, supra. En ausencia de un interés apremiante del Estado, o en el caso de individuos particulares, de aquellos intereses de igual jerarquía que transciendan el ámbito de lo privado y claramente afecten la política pública, no podrá violarse esta zona de la intimidad protegida por el Art. II, Sec. 8 de nuestra Constitución, *supra*.

▮▮▮ Por lo tanto, cualquier persona que sea víctima de discrimen en su empleo por razón de su matrimonio (o cualquiera de las otras formas constitucionalmente prohibidas), podrá acudir a los tribunales mediante una solicitud de interdicto para que se ordene al patrono que cese y desista de continuar dicha práctica. A su vez, tendrá derecho a reclamar por los daños y perjuicios y, en aquellos

---

[14] Sobre la importancia del matrimonio, como carácter fundamental de la familia, se ha dicho que:

"La conjunción vital de un hombre y una mujer para su constitución en bloque familiar, una vez incorporados a ellos los hijos que hubieren, es carácter y finalidad indeclinable del matrimonio. Es más, es esa unión familiar, ese conglomerado de seres unidos por la sangre, el pasado y los ideales, así como por la necesidad de superar las inmediatas exigencias de la vida, la razón primordial del matrimonio, la razón eterna. En el estudio de cualquier institución —pero más acusadamente en aquellas que tienen su base en la propia Naturaleza y que no son productos de exigencias económicas, políticas o religiosas— hay que estar tan pendientes del pasado, como del presente, como del futuro, y no cabe imaginar para el futuro ningún medio supletorio de la institución familiar para la adecuada formación del hombre." E. Klett, *Matrimonio, separación y divorcio: en la legislación actual y en la historia*, 2da ed., Pamplona, Ed. Aranzadi, 1984, pág. 52.

casos de despido, podrá solicitar la reposición en el empleo. *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 64.

Esta protección constitucional ha generado abundante legislación social protectora del trabajo. Entre las más importantes y abarcadoras se encuentra la Ley Núm. 100, *supra*. Ésta prohíbe que una persona sea despedida de su empleo o que, de otro modo, se viese afectada negativamente por motivo de su edad, raza, color, religión, origen o condición social. *Maldonado v. Banco Central*, 138 D.P.R. 268 (1995); *Santini Rivera v. Serv Air, Inc.*, 137 D.P.R. 1 (1994); *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 468 (1990); *García v. Shiley Caribbean, Etc.*, 122 D.P.R. 193 (1988); *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42, 50 (1983).

■ En respuesta a la generalizada práctica patronal de no emplear en la misma empresa personas casadas entre sí, o cesantearlos por el sólo hecho de haber contraído matrimonio con otro empleado de la misma empresa, nuestra Asamblea Legislativa promulgó la Ley Núm. 116 de 20 de diciembre de 1991 (29 L.P.R.A. secs. 146–147a). Esta ley enmendó las disposiciones de la Ley Núm. 100, *supra*, para incluir una prohibición expresa sobre el discrimen por razón de matrimonio. Exposición de Motivos de la Ley Núm. 116, *supra*, 1991 Leyes de Puerto Rico 956.

En lo pertinente, la Sec. 1 de la Ley Núm. 116, *supra*, dispuso:

> De igual modo, constituirá una práctica discriminatoria e incurrirá en la responsabilidad civil y penal antes expuesta, todo patrono que cometa cualquiera de los actos que se señalan en el primer párrafo de este artículo por razón de tratarse de una persona casada con un empleado o empleada de su empresa o negocio. Esta disposición se aplicará tanto a aspirantes a empleo como *a aquellas personas ya empleadas por el patrono que contraigan matrimonio entre sí.* (Énfasis suplido.) 29 L.P.R.A. sec. 146.

Dicha ley hace una especie de reserva en aquellos casos

en que la relación matrimonial *claramente* cree un *"conflicto de funciones"* que pudiera afectar el funcionamiento de la empresa. Una vez demostrado el conflicto, antes de proceder a despedir o a no contratar al empleado, el patrono deberá hacer un ajuste o acomodo razonable en las funciones de los empleados o aspirantes al empleo. Sec. 1 de la Ley Núm. 116, *supra*.

Sin embargo, en los casos en los que el patrono logre demostrar que el matrimonio entre dos (2) de sus empleados tendrá un efecto detrimental y adverso en el normal funcionamiento del departamento, el área de trabajo o la empresa en general, podrá terminar la relación laboral con *uno* de los empleados. Ello constituirá justa causa para el despido. En la determinación de lo que constituye un acomodo razonable, el tribunal deberá evaluar, entre otros, factores tales como el "tamaño de las facilidades [sic] físicas de la empresa y número de empleados, el organigrama, jerarquía y línea de mando, las necesidades físicas de la empresa y los problemas o dificultades específicos [sic] que sucitaría el matrimonio". Sec. 1 de la Ley Núm. 116, *supra*. A esto podemos añadir que el patrono deberá demostrar la inexistencia de una medida menos onerosa o drástica que el despido.[15]

Por lo tanto, corresponde al patrono demostrar que existe un claro conflicto de funciones por razón del matrimonio que afecte adversamente el funcionamiento de la empresa, la imposibilidad de llevar a cabo el acomodo ra-

---

[15] A esos efectos, la Sec. 1 de la Ley Núm. 116 de 20 de diciembre de 1991 (29 L.P.R.A. sec. 146), dispone:

"Lo anterior debe hacerse de tal forma que no afecte el derecho del patrono a reglamentar razonablemente las condiciones de trabajo de matrimonios en el mismo departamento, división o facilidades físicas.

"En esa determinación deberán considerarse los siguientes factores: tamaño de las facilidades físicas de la empresa y número de empleados, el organigrama, jerarquía y línea de mando, las necesidades físicas de la empresa y los problemas o dificultades específicos que suscitaría el matrimonio." 29 L.P.R.A. sec. 146. Véase, además, *Sostre Lacot v. Echlin of P.R., Inc.*, 126 D.P.R. 781, 798–799 (1990), opinión disidente del Juez Asociado Señor Negrón García, a la cual se une la Juez Asociada Señora Naveira de Rodón.

zonable o que éste fue rechazado por ambos empleados. Sólo así se considerará el despido justificado. Cualquier otra justificación para el despido del empleado deberá ser evaluada conforme a los criterios de la Ley Núm. 80, *supra*, sobre los despidos injustificados.

Por otro lado, la Ley Núm. 100, *supra*, establece una presunción de discrimen. Su Art. 3 dispone:

> Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizados sin *justa causa*. Esta presunción será de carácter controvertible. (Énfasis suplido.) 29 L.P.R.A. sec. 148.

Sobre el significado de "justa causa", hemos utilizado a manera de referencia, y sin ánimo de ser exhaustivos, las circunstancias enumeradas en el Art. 2 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185b.[16] *Soto v. Hotel Caribe Hilton*, 137 D.P.R. 294 (1994); *Rivera Águila v. K-Mart de P.R.*, 123 D.P.R. 599, 610 (1989); *Báez García v. Cooper Labs., Inc.*, 120 D.P.R. 145, 151–152 (1987).

De igual forma, las reclamaciones tramitadas al amparo de la Ley Núm. 80, *supra*, favorecen, con una presunción,

---

[16] El Art. 2 de la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185b), dispone, en lo pertinente:

"Se entenderá por justa causa para el despido de un empleado de un establecimiento:

"(a) Que el obrero siga un patrón de conducta impropia o desordenada.

"(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.

"(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

"(d) Cierre total, temporero o parcial de las operaciones del establecimiento.

"(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento, y los cambios en los servicios rendidos al público.

"(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias anticipadas o que prevalecen al ocurrir el despido.

"No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento." 29 L.P.R.A. sec. 185b.

al empleado querellante. Su Art. 8 (29 L.P.R.A. sec. 185k) dispone, en lo pertinente, que "el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado". De ahí que el patrono deberá rebatir dicha presunción. Establecerá, mediante preponderancia de la evidencia, que el despido estuvo justificado. *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 D.P.R. 643 (1994); *Rivera Águila v. K-Mart de P.R.*, supra; *Srio. del Trabajo v. I.T.T.*, 108 D.P.R. 536, 544 (1979).

En nuestra jurisdicción las presunciones tienen el efecto de transferir al demandado el peso de *producir* la evidencia y, además, el de *persuadir* al juzgador.[17] Regla 14 de Evidencia, 32 L.P.R.A. Ap. IV; *Ibáñez v. Molinos de P.R., Inc.*, supra, pág. 51.

Según la presunción de discrimen contenida en el Art. 3 de la Ley Núm. 100, *supra,* una vez el empleado establece las circunstancias esenciales para que el juzgador pueda asumir el hecho presumido —que el despido o acción perjudicial se realizó sin justa causa— se invierte la carga probatoria. Corresponde al patrono rebatir la presunción de discrimen. Demostrará, con preponderancia de la prueba, que el despido *no* fue discriminatorio. Esto es, que se presentará evidencia de calidad suficiente para convencer al juzgador que la existencia del discrimen era menos probable que su inexistencia. Reglas 13 y 14 de Evidencia, *supra*; *Ibáñez v. Molinos de P.R., Inc.*, supra, pág. 53.

En esta etapa, el patrono no tiene que probar necesariamente la causa del despido. Bastará con que pruebe que la razón de éste no fue discriminatoria. En otras palabras, si el patrono demuestra, a satisfacción del tribunal, que la

---

[17] "Persuadir" se define como "convencer. Inducir a creer o hacer una cosa". *Diccionario General Ilustrado de la Lengua Española VOX*, 1ra ed., Barcelona, Ed. Biblograf, 1987, págs. 842–843.

razón discriminatoria alegada por el demandante no fue el *motivo determinante* para el despido, quedará rebatida la presunción. Derrotada la presunción, le corresponde al demandante presentar prueba dirigida a establecer la existencia de discrimen.

Ahora bien, si luego de presentada la *totalidad* de la prueba queda demostrado que no hubo ánimo discriminatorio para el despido, pero el demandado no logró establecer una justificación razonable para éste (justa causa), el tribunal deberá concluir que el despido fue injustificado y el empleado será acreedor, *exclusivamente*, de los remedios establecidos en la Ley Núm. 80, *supra*, de despidos injustificados. *Cf. Soc. de Gananciales v. Royal Bank de P.R.*, 145 D.P.R. 178 (1998).

De lo anterior surge que es imperativo que el juzgador establezca la intención del patrono al momento de realizar el despido. Por ello, la credibilidad de los testigos de ambas partes es determinante para la adjudicación final del caso. *Soto v. Hotel Caribe Hilton*, supra.

Cabe puntualizar que las Leyes Núms. 100 y 80, *supra*, son estatutos de carácter reparador y deberán ser interpretados liberalmente en favor de los derechos del trabajador. *Beauchamp v. Holsum Bakers of P.R.*, 116 D.P.R. 522 (1985); *Negrón v. C.I.T. Fin. Serv.*, 111 D.P.R. 657 (1981); *Srio. del Trabajo v. I.T.T.*, supra; *Martínez Reyes v. Tribunal Superior*, 104 D.P.R. 407 (1975); *Piñán v. Mayagüez Sugar Co., Inc.*, 84 D.P.R. 89 (1961).

Finalmente, hemos de recordar que la apreciación de la prueba del Tribunal de Primera Instancia será respetada y no intervendremos con ella, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Méndez v. Morales*, 142 D.P.R. 26 (1996); *Oliveras, Inc. v. Universal Ins. Co.*, 141 D.P.R. 900 (1996); *Monllor v. Soc. de Gananciales*, 138 D.P.R. 600 (1995); *Orta v. Padilla*, 137 D.P.R. 927 (1995); *Rodríguez Oyola v. Machado Díaz*, 136 D.P.R.

250 (1994); *Coop. Seguros Múltiples de P.R. v. Lugo*, 136
D.P.R. 203 (1994); *Levy v. Aut. Edif. Públicos*, 135 D.P.R.
382 (1994); *Rodríguez Amadeo v. Santiago Torres*, 133
D.P.R. 785 (1993); *Gallardo v. Petitón García y V.T.N., Inc.*,
132 D.P.R. 39 (1992); *Pérez v. Col. Cirujanos Dentistas de
P.R.*, 131 D.P.R. 545 (1992); *Benítez Guzmán v. García Mer-
ced*, 126 D.P.R. 302, 308 (1990); *Selosse v. Fund. Educ. Ana
G. Méndez*, 122 D.P.R. 534, 545 (1988); *Rivera Pérez v.
Cruz Corchado*, 119 D.P.R. 8 (1987); *Valencia, Ex parte*, 116
D.P.R. 909 (1986); *Sánchez Rodríguez v. López Jiménez*,
116 D.P.R. 172 (1985); *Pérez Cruz v. Hosp. La Concepción*,
115 D.P.R. 721 (1984); *Morán Simó v. Gracia Cristóbal*,
106 D.P.R. 155 (1977).

### III

Repasados estos principios, evaluemos los méritos del
recurso. Alega MOC que, como cuestión de derecho, las dis-
posiciones de la Ley Núm. 100, *supra*, referentes al discri-
men por razón de matrimonio no aplican a los hechos par-
ticulares ante nos. Según esta tesis, al momento en que
decidieron "no invitar a Belk a seguir en el bufete", éste y
Serapión no coincidían como empleados, pues para esa fe-
cha ya la anterior sociedad había sido disuelta, excluyén-
dolos a ambos de la recién creada firma. Razonan que al
momento de dejar fuera del bufete a Belk, éste no era "una
persona casada con un empleado o empleada" de la misma
empresa o negocio, según requiere la Ley Núm. 100, *supra*.
Plantean, además, que la acción tomada contra Belk no
constituyó un despido. *No tienen razón.*

No existe controversia sobre la condición de
MOC como patrono sucesor de MOCS. Así fue estipulado
antes de celebrarse el juicio. Según esta clasificación, la
nueva sociedad asumió todas las obligaciones contraídas
por el patrono anterior. *J.R.T. v. Asoc. C. Playa Azul I*, 117
D.P.R. 20 (1986); *J.R.T. v. Coop. Azucarera*, 98 D.P.R. 314

(1970); *J.R.T. v. Club Náutico*, 97 D.P.R. 386 (1969); *Beaunit of Puerto Rico v. J.R.T.*, 93 D.P.R. 509 (1966). Recientemente extendimos la aplicación de la doctrina del patrono sucesor a los casos de despidos discriminatorios. *Bruno López v. Motroplan, Inc. y otros*, 134 D.P.R. 111 (1993).

La prueba desfilada demostró que existía una *continuidad casi absoluta* entre las operaciones de MOCS y el nuevo bufete MOC. De las estipulaciones surge que MOC retuvo a la mayoría de los empleados que laboraban en MOCS y fueron mantenidos en sus antiguos puestos. El Tribunal de Primera Instancia concluyó que MOCS fue disuelto el 1ro de mayo de 1992. Quedó establecido que en esa fecha Belk no fue notificado de despido alguno y éste trabajó durante todo el día en el nuevo bufete. Al día siguiente —el 2 de mayo— Belk se presentó a trabajar, y no fue hasta horas de la tarde cuando le notificaron que no integraría el nuevo bufete.

No cabe duda. La evidencia demostró que MOC advino patrono de Belk y que éste fue *despedido* de dicho bufete el 2 de mayo. El mero hecho de la sustitución de un patrono por otro no tiene el efecto de terminar la relación obrero-patronal existente. *Beaunit of Puerto Rico v. J.R.T.*, supra, pág. 515. Cualquier otra interpretación sería una ficción que derrotaría la política laboral y fomentaría la práctica de disolver la sociedad o corporación con el único propósito de evadir el cumplimiento con la legislación protectora del trabajo.

Tampoco podemos atribuirle responsabilidad a los terceros demandados Sierra y Serapión. Quedó demostrado que la disolución del bufete MOCS fue llevada a cabo *exclusivamente* por los licenciados Martínez, Odell y Calabria contra la expresa voluntad de Sierra y Serapión, y sin su participación. Imponerle responsabilidad a éstos sería lo mismo que decir que fueron responsables de su propio despido. Aclarados estos extremos, queda por examinar si

la razón para el despido fue discriminatoria y/o injustificada, a tenor con nuestra legislación laboral.

 MOC argumenta que los estatutos antes citados exigen al demandante probar que el despido estuvo fundamentado o motivado en la *política discriminatoria* del patrono contra los matrimonios entre empleados. El argumento es erróneo. Ni la Ley Núm. 100, *supra*, ni su jurisprudencia interpretativa exigen como condición *sine qua non* que se pruebe la existencia de una política discriminatoria en la empresa para que el juzgador pueda concluir que el despido fue por razón del matrimonio. El discrimen en el empleo se puede configurar de múltiples maneras. Entre ellas, mediante un incidente aislado o mediante la aplicación de una política empresarial. En esta última modalidad, *no* se requiere la existencia de una política *escrita* al respecto. Basta con que esa sea la motivación para el despido para configurar una violación a las disposiciones de la ley.

## IV

Una vez establecida la aplicabilidad de las Leyes Núms. 100 y 80, *supra*, analicemos la prueba. MOC alega que no hubo prueba para demostrar que los socios demandados conocían del matrimonio entre Belk y Serapión antes de efectuarse la disolución del bufete MOCS. Aducen que erró el tribunal al concluir que el despido fue discriminatorio. Tampoco tienen razón.

Ciertamente, el Tribunal de Primera Instancia tuvo ante sí abundante prueba para concluir, como lo hizo, que los demandados tuvieron conocimiento, al menos dos (2) años antes de la disolución, de que Belk y Serapión habían contraído matrimonio. La prueba presentada por MOC, a los efectos de establecer su desconocimiento sobre el matrimonio, estuvo plagada de contradicciones. Más aún, Mar-

tínez y Odell declararon en pleno juicio que sabían del matrimonio porque el ex esposo de Serapión —Rodríguez Poggi— se lo había informado al primero.

## V

En su demanda, Belk reclamó un resarcimiento por alegadamente haber sido despedido del bufete MOC sin justa causa y por razón de su matrimonio con Serapión, mientras ambos eran empleados en el bufete MOCS.

Estas alegaciones son suficientes para establecer que el despido de Belk fue injustificado, según las definiciones del Art. 2 y la presunción del Art. 8 de la Ley Núm. 80 de despidos injustificados, *supra*. De esta forma quedó activada la presunción de discrimen del Art. 3 de la Ley Núm. 100, *supra*. En consecuencia, MOC estaba obligado a alegar y probar que el despido de Belk no fue discriminatorio para rebatir dicha presunción.

Al respecto sostiene que la prueba demostró que la única causa o motivo para despedir a Belk fue *la falta de confianza* de los socios, criterio que argumentan es perfectamente válido, pues la lealtad de Belk estaba con los anteriores socios Sierra y Serapión.

Sobre esta justificación, en *Wolf v. Neckwear Corporation of P.R.*, 80 D.P.R. 537, 541 (1958), resolvimos que la *"mera falta de confianza"* del patrono en el empleado no constituye una causa justificada para el despido. La falta de confianza, como justificación válida para el despido, no puede tratarse del *"mero sentimiento subjetivo del patrono"*. (Énfasis suplido.) Éste deberá demostrar que el empleado faltó a sus deberes "violando reglas u órdenes del patrono, demostrando negligencia, ineptitud o ineficiencia en su trabajo o incurriendo en fraude, deslealtad grave o en faltas de honradez, etc.". Sólo ante esos hechos objetivos es que la falta de confianza podría ser una justificación

razonable para el despido. (Énfasis suplido.) Íd. Véase, además, *Srio. del Trabajo v. I.T.T.*, supra, págs. 546–547.

Nuevamente es preciso señalar que en esta etapa el patrono no estará obligado a demostrar la causa para el despido. Basta con que pruebe que la acción discriminatoria era menos probable que su existencia. MOC no pudo convencer al tribunal de que el despido no fue discriminatorio. Éstos trataron de establecer, mediante el testimonio de su único testigo, el demandado licenciado Odell, que durante el período de tiempo en que surgieron ciertas diferencias entre los socios propietarios, en relación con la aprobación de un nuevo contrato de sociedad, Belk hizo expresiones y realizó actos en apoyo a las posiciones disidentes asumidas por Sierra y su esposa Serapión. Alegaron, además, que las lealtades de Belk estaban con Sierra y Serapión, por lo que no le tenían ningún tipo de confianza.

La prueba demostró que al momento de surgir las diferencias entre los socios propietarios, Belk se desempeñaba como *junior partner*. Éste no pertenecía al Comité Ejecutivo de MOCS, tampoco asistía a sus reuniones y, mucho menos, tenía injerencia en la toma de decisiones de la firma, pues esa era labor exclusiva de los socios propietarios. No se presentó prueba de que Belk realizara actos en contra de los intereses de los socios demandados, como tampoco hubo evidencia de que se solidarizara con las posiciones asumidas por Sierra y Serapión. No hay duda de que Belk nada tuvo que ver con la pugna y tirantez existentes entre los socios propietarios.

No es válido tampoco el argumento de que, con su matrimonio, Belk no violó norma o reglamento algunos, pues en ese entonces no existía ninguno al efecto. Tampoco se le comunicó la existencia de una supuesta norma *no* escrita que prohibiera los matrimonios entre empleados, la cual, de todas formas, sería contraria a la Ley Núm. 100, *supra*, y no constituiría *justa causa* al amparo del Art. 2(c) de la

Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185b(c). Lo que sí quedó claramente probado era que los socios demandados tenían preferencias personales contra los matrimonios entre empleados del bufete. MOC no logró demostrar razones objetivas válidas para justificar dichas preferencias.

Por otro lado, quedó establecido que Serapión no supervisaba directamente a Belk y que, en cuanto a las evaluaciones y la compensación, no le dio un trato distinto del que recibiera de los demás socios propietarios. Sobre la labor de Belk, la prueba estableció que su trabajo era excelente y que era, además, uno de los abogados más productivos de la firma. Sus relaciones con los demás empleados y socios siempre fue muy buena. Nunca hubo comentarios negativos sobre su desempeño.

Por otro lado, MOC no planteó ante el tribunal a quo la imposibilidad de un acomodo razonable de los licenciados Belk y Serapión. Tampoco se presentó evidencia alguna sobre el alegado conflicto de funciones existente entre ambos. Sí quedó demostrado que Belk y Serapión llevaban tres (3) años de matrimonio, pero nunca se señaló conflictos o efectos adversos en el funcionamiento del bufete por ese motivo.

En cuanto a la omisión de informar a los socios sobre su matrimonio con Serapión, se demostró que su conducta se debió a su temor de ser despedido a manera de represalia. MOC no presentó prueba de que Belk obtuviera algún beneficio por su silencio o que su omisión afectara los intereses del bufete.

Tampoco nos convence el argumento de que dicha omisión fue la razón para el despido. MOC advino en conocimiento del hecho del matrimonio de Belk mucho antes de la disolución del bufete, y no fue hasta transcurridos dos (2) años cuando decidieron actuar sobre el asunto. Ante estas circunstancias, nos preguntamos: ¿por qué no despidieron a Belk en el momento cuando supieron que había ocultado su matrimonio con Serapión?

El Tribunal de Primera Instancia tuvo ante sí prueba suficiente para concluir que el motivo para el despido de Belk fue su matrimonio con Serapión y que, de no haber sido por las diferencias existentes entre los demandados y Serapión, Belk no hubiese sido despedido.[18] No hemos encontrado en el expediente prueba alguna que justifique la pérdida de confianza en Belk. Todo lo contrario, ésta estableció que Belk gozaba de la confianza de los socios demandados, a tal punto que en ocasiones le delegaban sus asuntos contributivos.[19]

La prueba presentada por MOC no logró rebatir la presunción de discrimen por razón de matrimonio. Mucho menos pudo establecer una razón justificada para el despido. Así lo concluyó el tribunal a quo. No existe fundamento alguno en la prueba que nos mueva a alterar esa determinación.

## VI

Lo anterior no dispone de todas las controversias. MOC discute que erró el tribunal de instancia al declarar con lugar las reclamaciones de Belk al amparo de la Constitución y de las Leyes Núms. 100 y 80, *supra*, por ser éstas

---

[18] Por otro lado, hubo evidencia contundente demostrativa del ánimo discriminatorio de MOC hacia los matrimonios entre empleados del bufete. *Primero*, la inclusión de la Cláusula 13.03 del Proyecto de Contrato de Sociedad un (1) mes antes de la disolución de MOCS es una expresión clara de la intención discriminatoria contra los matrimonios, pues ella ofrece un trato desigual a estas parejas y no provee para la relocalización ni para su acomodo razonable. *Segundo*, los comentarios del licenciado Martínez al consultor Mudrick evidencian su conocimiento sobre el matrimonio de Belk y Serapión, y su desconfianza hacia Serapión por este hecho. *Tercero*, las indagaciones del licenciado Martínez sobre la relación entre Belk y Serapión en fecha tan cercana a la disolución del bufete es otro evento indicativo de la intención discriminatoria de los demandados. *Cuarto*, la negativa del licenciado Odell de reemplear a Belk y a Serapión en el nuevo bufete por estar casados entre sí.

[19] No nos persuaden los demandados al aseverar que erró el tribunal al descartar los testimonios de Odell y Martínez. Las contradicciones incurridas por éstos en lo referente a su conocimiento del matrimonio de Belk, y en otras áreas, bastaban para que no les mereciera credibilidad sus testimonios. No hay base en la prueba para que podamos intervenir en la apreciación que de ésta hiciera el tribunal de instancia.

mutuamente excluyentes, por lo que se estaría penalizando al patrono más de una vez por un sólo acto.

En su sentencia, el tribunal de instancia le otorgó a Belk una compensación por los "sufrimientos y angustias mentales" causados por la violación a la Ley Núm. 100, *supra*, y su derecho a la intimidad al amparo de la Constitución, ascendente a la cantidad de quince mil dólares ($15,000), más la doble penalidad que ordena la Ley Núm. 100, *supra*. Ello totaliza treinta mil dólares ($30,000). MOC argumenta que esta partida constituye "enriquecimiento injusto al recibir compensación bajo dos leyes distintas que tienen los mismos elementos".

■ El legislador, al establecer la política pública laboral, puede, mediante legislación al efecto, *ampliar* los remedios provistos por la Constitución, fijar la forma y los procedimientos que se han de seguir al tramitar un caso de discrimen e imponer ciertos requisitos evidenciarios que garanticen una mayor vigencia a dicha política.

Esa es la situación de la Ley Núm. 100, *supra*, creada con el propósito de hacer viable las reclamaciones por discrimen. En su Art. 1(a)(1), la Ley Núm. 100, *supra*, dispone que el patrono incurrirá en responsabilidad civil *"por una suma igual al doble del importe de los daños que el acto haya causado al empleado"*. (Énfasis suplido.) 29 L.P.R.A. sec. 146(a)(1). De una lectura de esta disposición surge que no estamos ante una doble compensación por una misma conducta, sino que la Ley Núm. 100, *supra*, impone, a manera de penalidad, una suma igual a la compensación por los *daños sufridos por el empleado al ser despedido por razones discriminatorias*. Ciertamente, el tribunal de instancia no diferenció las partidas por daños concedidos según uno u otro cuerpo legal. Simplemente aplicó la penalidad de la Ley Núm. 100, *supra*. No erró ese tribunal.

■ Respecto al pago de la "mesada" al amparo de la Ley Núm. 80, *supra*, sobre despidos injustificados, MOC

argumenta que no debe ser concedida una vez se indemnice al empleado al amparo de la Ley Núm. 100, *supra,* pues la última excluye a la primera. Le asiste la razón.

Como la Ley Núm. 100, *supra,* compensa por los daños sufridos por el empleado, estos daños incluyen remediar los mismos que la Ley Núm. 80, *supra,* indemniza. La Ley Núm. 100, *supra,* compensa adecuadamente todos los daños que sufre el empleado despedido. Conceder una indemnización al amparo de dos (2) leyes distintas que tienen los mismos elementos, criterios y dependen de la misma prueba, penalizaría al patrono dos (2) veces por un sólo acto.

Por otro lado, MOC reclama que las compensaciones concedidas en concepto de mesada y de lucro cesante son excesivas. Argumenta que el tribunal erró al utilizar como base para efectuar estos cómputos que el salario mensual de Belk ascendía a ocho mil ciento tres dólares ($8,103).[20] Surge del expediente que el tribunal utilizó el informe pericial de Belk para llegar a su conclusión en lo referente al salario del demandante mientras trabajó en el bufete MOCS. Sin embargo, examinada la totalidad del expediente no hemos encontrado que MOC presentara prueba alguna para controvertir las conclusiones de la prueba pericial de Belk, a pesar de tener acceso a toda la información sobre sus ingresos.

Es norma reiterada que no intervendremos con las sumas concedidas por el tribunal, a menos que éstas sean muy bajas o exageradamente altas. MOC no nos coloca en condición de poder hacer esa determinación, por lo cual no intervendremos con las cuantías otorgadas. Véanse: *Cotto Morales v. Ríos,* 140 D.P.R. 604 (1996); *Vélez Rodríguez v. Amaro Cora,* 138 D.P.R. 182 (1995). Sin em-

---

[20] Este sueldo incluye un salario básico de cuarenta y tres mil ochocientos dólares ($43,800), más beneficios marginales, como pago de auto, de siete mil doscientos dólares ($7,200), gastos generales reembolsados por doce mil dólares ($12,000), y vacaciones por dos mil ciento cuarenta y seis dólares ($2,146).

bargo, es menester señalar que al estimarse los ingresos dejados de devengar por el empleado despedido, los beneficios marginales dejados de recibir deben ser incluidos como parte de esta partida. *Odriozola v. S. Cosmetic Dist. Corp.*, supra, págs. 504–505.

## VII

Por último, MOC impugna la imposición de honorarios de abogado. El tribunal de instancia le impuso honorarios en las partidas siguientes: cinco mil dólares ($5,000) bajo la Ley Núm. 100, *supra*, y la Constitución; dos mil dólares ($2,000) al amparo de la Ley Núm. 80, *supra*, y dos mil dólares ($2,000) por la temeridad desplegada en relación con el asunto del patrono sucesor. Alega MOC que la Ley Núm. 100, *supra*, y la Constitución no proveen una "condena automática y mandatoria en honorarios de abogado sino que éstos proceden sólo si hay una determinación correcta de temeridad". *No tiene razón.*

El Art. 4 de la Ley Núm. 100, *supra*, 29 L.P.R.A. sec. 149, dispone que el Tribunal *impondrá* una suma razonable en concepto de los honorarios al patrono contra quien recayó la sentencia. Igual disposición provee el Art. 11 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185k. Ninguna de estas leyes requiere de una determinación previa de temeridad.[21] Según lo resuelto en *López Vicil v. ITT Intermedia, Inc.* 143 D.P.R. 574 (1997), al abogado del demandante le corresponde preliminarmente el veinticinco por ciento (25%) de la indemnización básica que Belk Arce reciba ascendente a cincuenta y nueve mil cuatrocientos setenta y cuatro dólares con treinta y cuatro centavos

---

[21] Véase el Art. 2 de la Ley Núm. 402 de 12 de mayo de 1950 (32 L.P.R.A. sec. 3115), Ley de Reclamaciones Laborales. Éste establece que el empleado que reclame cualquier derecho o suma de dinero contra su patrono, al amparo de la legislación laboral federal o local, y en que se conceda dicha reclamación en todo o en parte, se condenará al patrono al pago de honorarios de abogado. 32 L.P.R.A. secs. 3114–3117.

($59,474.34) por lucro cesante, más quince mil dólares ($15,000) por sufrimientos y angustias mentales por violación a la Ley Núm. 100, *supra*, y la Constitución, para un total de dieciocho mil seiscientos dieciocho dólares con cincuenta y nueve centavos ($18,618.59) en honorarios al amparo de la Ley Núm. 100, *supra*. El abogado, a su discreción, podrá someter un memorando jurado conforme a lo resuelto en *López Vicil v. ITT, Intermedia, Inc.*, supra, para así obtener un aumento en sus honorarios, si ese fuera el caso. De presentarse el memorando, el tribunal lo evaluará acorde con lo expresado en *López Vicil v. ITT, Intermedia, Inc.*, supra.

Por los fundamentos antes expuestos, *se dictará la sentencia correspondiente para revocar la indemnización de diecinueve mil trescientos veinticuatro dólares con cuarenta y siete centavos ($19,324.47) en concepto de mesada, y dos mil dólares ($2,000) en honorarios, concedidos según la Ley Núm. 80 y modificar la indemnización de honorarios según la Ley Núm. 100 a los fines de reconocer dieciocho mil seiscientos dieciocho dólares con cincuenta y nueve centavos ($18,618.59). Así modificada, se confirmará.*[22]

El Juez Asociado Señor Rebollo López emitió una opinión disidente. El Juez Asociado Señor Corrada Del Río no intervino.

---

[22] Esta decisión en nada afecta el trámite relativo a la queja disciplinaria (AB-98-44) contra el licenciado Belk Arce por alegadamente comparecer como soltero en una escritura pública y aparecer con el mismo estado civil en los Registros de Testimonios de ciertos notarios, abogados empleados en el Bufete Martínez, Odell y Calabria.

Similar queja pende contra su esposa, la licenciada Serapión.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Al decidir un caso, los integrantes de este Tribunal tenemos la obligación de utilizar al máximo el conocimiento adquirido a través de las diferentes vivencias que hemos tenido a lo largo de los años, aplicando dicho caudal de conocimientos al caso ante nuestra consideración con el propósito de descubrir la verdadera y real situación de hechos del mismo.

Sólo así podremos entender, *y aquilatar*, a plenitud el comportamiento normal y ordinario de los seres humanos que comparecen ante las puertas de este Foro en busca de solución para los conflictos y problemas en que se ven involucrados.

I

No tenemos reparo alguno a la aseveración mayoritaria de que la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*) "tiene como propósito proteger el derecho a la intimidad de los empleados y [que] expresamente cubre el [tipo del alegado] discrimen que es objeto de esta controversia". Opinión mayoritaria, pág. 226. Tampoco tenemos objeción alguna a lo expresado por el Tribunal a los efectos de que "existe una clara política pública en favor de la protección y el fortalecimiento de la familia" y de que el "matrimonio, como institución básica, contribuye como ninguna otra al robustecimiento y vitalidad de la familia, componente medular de nuestra sociedad". Íd., págs. 230–231. *No* puede ser de otra manera.

Lo que objetamos, *de manera vehemente*, es la conclusión de este Tribunal de que en el presente caso la única, principal y determinante razón para despedir de su empleo

al Lcdo. John T. Belk —como abogado de la sociedad Martínez, Odell y Calabria— que tuvo el referido bufete de abogados lo fue el hecho escueto de que éste había contraído matrimonio con la Lcda. Margarita Serapión y que, en consecuencia, procede la confirmación de la sentencia recurrida que así lo determinó.

No tenemos duda alguna de que el hecho del matrimonio fue el germen, o la semilla, que causó o desembocó en la total "falta de confianza" en el licenciado Belk, de parte de los socios propietarios del mencionado bufete de abogados, "falta de confianza" que sí fue la principal razón para el despido del primero.

Debemos, todos, cuestionarnos: en el ejercicio de una profesión, como la abogacía, *en que la confianza juega un papel principalísimo*, ¿puede alguien confiar en una persona que oculta por un período de dos (2) años el hecho de que ha contraído matrimonio con una compañera de trabajo? Es correcto que el licenciado Belk no tenía la obligación legal de informar que se había casado; pero, ¿por qué ocultarlo? ¿Nos hemos olvidado del sabio refrán pueblerino a los efectos de que el que miente en lo poco, miente en lo mucho? ¿Puede tenerse confianza en una persona que así actúa? ¿Podía, *además*, confiar plenamente el bufete de Martínez, Odell y Calabria en el esposo de una ex socia con quien ellos habían roto la sociedad, por otras razones, y con quien sus relaciones *no* eran cordiales?

Como, incluso, correctamente señala la Mayoría, hemos resuelto que cuando un patrono alega "falta de confianza" como la razón del despido, éste debe demostrar que el empleado violó reglas u órdenes del patrono, que el empleado es negligente, inepto o ineficiente en su trabajo, o que *ha incurrido en fraude, deslealtad grave o en faltas de honradez*. Véase *Wolf v. Neckwear Corporation of P.R.*, 80 D.P.R. 537 (1958). *Cabe preguntarse*: ¿no constituye un fraude, una deslealtad grave, o una falta de honradez de

parte de un asociado de un bufete de abogados el ocultar por dos (2) años el matrimonio con uno de los jefes o socios propietarios del mismo?

La Mayoría argumenta —con el propósito de demostrar que la referida actuación no tiene mayor relevancia— que la licenciada Serapión no era el "jefe inmediato" de su esposo, el licenciado Belk. Nuevamente, cabe preguntarse: ¿Es eso lo verdaderamente determinante? Además, durante ese período de dos (2) años, al discutir los socios los méritos de los asociados, ¿acaso ella —en aras de mantener oculto el matrimonio— no participó en las evaluaciones y concesiones de aumentos de salario y bonos que se le hicieron al licenciado Belk?

Por último, debemos todos hacernos la siguiente pregunta: si la norma imperante en esta clase de casos —como, incluso, acepta la Mayoría— es a los efectos de que, para derrotar la presunción de discrimen que establece la citada Ley Núm. 100, el patrono *no* tiene que probar la causa del despido sino que *basta con que demuestre que la alegada razón discriminatoria no fue el "motivo determinante" para el despido*, ¿no es esto lo que, *precisamente*, ha sucedido en el presente caso? ¿Podemos, con absoluta tranquilidad de conciencia, decretar y decidir que al licenciado Belk lo despidieron de su empleo como abogado *meramente* por haber contraído matrimonio con una "compañera" de trabajo?

En conclusión: aparte del hecho de que la decisión que hoy se emite por una mayoría de los integrantes del Tribunal en cierta forma afecta, o mancha, la reputación de unos distinguidos miembros de la profesión legal, la misma, a nuestro humilde entender, constituye un premio a un individuo que no actuó con la honestidad que debe caracterizar siempre no sólo a un abogado, sino que a todo ser humano.

Es por ello que disentimos.