EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan José Eugenio Santiago Ortiz<br><br>Peticionario<br><br>v.<br><br>Real Legacy Assurance Company, Inc.; Cooperativa de Seguros Múltiples de Puerto Rico; Compañía de Seguro YZX<br><br>Recurridos | Certiorari<br><br>2021 TSPR 12<br><br>205 DPR \_\_\_\_ |

Número del Caso:  CC-2019-674

Fecha: 4 de febrero de 2021

Tribunal de Apelaciones:

    Panel V

Abogado de la parte peticionaria:

    Lcdo. Pedro José Cruz Soto

Abogado de la parte recurrida:

    Lcdo. Enrique J. Mendoza Méndez

Materia: Materia Derecho Laboral: En una demanda que acumule reclamaciones por la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley de indemnización por despido sin justa causa*, 29 LPRA sec. 185a *et seq.* y al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la *Ley contra el discrimen de empleo*, 29 LPRA sec. 146 *et seq.* (Ley 100) se descontará la indemnización por mesada recibida o adjudicada luego de la imposición de la doble penalidad que dispone el Art. 1(a)(1) de la Ley 100, *supra*.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan José Eugenio Santiago Ortiz

     Peticionario

         v.                        CC-2019-674

Certiorari

Real Legacy Assurance Company,
Inc.; Cooperativa de Seguros
Múltiples de Puerto Rico;
Compañía de Seguro YZX

     Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 4 de febrero de 2021.

El presente caso nos brinda la oportunidad de ilustrar a los tribunales la ecuación aritmética correcta para deducir la mesada regulada por la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley de indemnización por despido sin justa causa*, 29 LPRA sec. 185a *et seq.* (Ley 80) dentro de un litigio que acumule, además, una reclamación al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la *Ley contra el discrimen de empleo*, 29 LPRA sec. 146 *et seq.* (Ley 100).

Por los fundamentos que expondremos a continuación, resolvemos que cuando corresponda descontar la indemnización recibida o adjudicada, ésta se sustraerá luego de la imposición de la doble

penalidad que dispone el Art. 1(a)(1) de la Ley 100, *infra*.

I

El 15 de agosto de 2014 el Sr. Juan José Eugenio Santiago Ortiz (señor Santiago Ortiz o peticionario), mediante el procedimiento sumario de la Ley 2, *infra*, presentó una *Querella* sobre despido injustificado y discrimen por edad en contra de Real Legacy Assurance Company, Inc. (Real Legacy)[1] y la Cooperativa de Seguros Múltiples de Puerto Rico (Cooperativa). En síntesis, además de alegar la responsabilidad solidaria por el despido injustificado y discriminatorio, el peticionario reclamó el pago de mesada, salarios dejados de percibir, beneficios marginales, angustias mentales y daños económicos y a su reputación.

En vista de que la Cooperativa no respondió la querella dentro del término de 10 días que dispone la Ley 2, *infra*, el señor Santiago Ortiz solicitó al Tribunal de Primera Instancia la anotación de rebeldía en su contra.

Luego de varios trámites procesales que resultan innecesarios pormenorizar, el 14 de diciembre de 2015 el tribunal de instancia emitió una *Sentencia Parcial* en la que anotó la rebeldía a la Cooperativa, concedió la reclamación sobre despido injustificado y, por ello, la condenó al pago de $264,794.88 por concepto de mesada más $39,719.24 en

---

[1] Del expediente surge que Real Legacy Assurance Company, Inc. (Real Legacy)  presentó una solicitud de sentencia sumaria y argumentó la inexistencia de un despido discriminatorio por razón de edad. Ante este cuadro, el Tribunal de Primera Instancia atendió la referida moción y, al dictar la *Sentencia* recurrida, desestimó la causa de acción en contra de Real Legacy. De este modo, para fines de la presente Opinión sólo aludiremos a la Cooperativa de Seguros Múltiples de Puerto Rico (Cooperativa) como patrono del Sr. Juan José Eugenio Santiago Ortiz (señor Santiago Ortiz o peticionario).

honorarios de abogado. Además, señaló una vista para dilucidar los daños relacionados con la reclamación de discrimen por edad.[2]

El caso tuvo múltiples episodios ante el Tribunal de Apelaciones. En específico, la Cooperativa recurrió ante el foro apelativo intermedio para impugnar la determinación del foro de instancia de denegar la petición de ésta de presentar prueba pericial para la vista sobre daños. Luego de atender el argumento, el foro apelativo intermedio revocó el dictamen y **le ordenó al foro de instancia aceptar sólo la prueba pericial ofrecida para impugnar la cuantía de los daños alegados por el señor Santiago Ortiz.**

Así las cosas, el tribunal de instancia celebró las vistas sobre daños el 29 y 30 de noviembre de 2017. Por la parte demandante testificaron el señor Santiago Ortiz y el contador público autorizado, el Sr. Bernardo Bravo Acosta (perito del señor Santiago Ortiz). La Cooperativa, por su parte, presentó los testimonios de la Sra. Luisana Rincón Vela (señora Rincón Vela), Vicepresidenta Auxiliar de Recursos Humanos del Grupo Cooperativo de Seguros Múltiples y al contador, el Sr. Jorge A. Rodríguez Suárez (perito de la Cooperativa). Luego de aquilatar la prueba recibida, el tribunal de instancia emitió una *Sentencia* en la que condenó a la Cooperativa al pago de $1,394,405.68 más 15% en honorarios de abogado que, a su vez, equivalen a $209,160.85.

En su evaluación, el foro de instancia determinó que los peritos de ambas partes coincidieron en la metodología

---

[2] *Sentencia Parcial*, Apéndice de la Petición de *certiorari*, pág. 111.

para calcular el lucro cesante,[3] a saber: el periodo utilizado hasta los 65 años del señor Santiago Ortiz; la edad de 81 años como expectativa de vida;[4] el factor de 8% anual por diferencia entre los beneficios marginales recibidos en su empleo anterior y que no recibe en el actual;[5] el uso de 1.5% de crecimiento anual salarial; y el uso del 6% como valor presente.[6] Asimismo, concluyó que el señor Santiago Ortiz mitigó los daños al conseguir un empleo a los 8 meses tras ser despedido.

Respecto a la **pérdida de ingresos por concepto del plan de retiro**, el foro de instancia decretó que, según el *Employees retirement plan certificate of participation for Juan J. Santiago* (Certificado de participación) que Real Legacy preparó para el peticionario en el 2010 y al testimonio de la señora Rincón Vela, al señor Santiago Ortiz le correspondía recibir $10,169.41 mensuales del plan de retiro una vez éste cumpliera 65 años. Con relación a estas proyecciones, el perito de la Cooperativa discrepó pues, según expuso, a raíz del cambio en el plan de retiro -que entró en vigor el 1 de enero de 2016- y de la *Certificación cálculos de beneficio por retiro* (Certificación Actuarial) que preparó una

---

[3] *Determinación de hechos núm. 55 de la Sentencia*, Apéndice de la Petición de *certiorari*, pág. 276.

[4] Véase *Tabla de expectativa de vida para Puerto Rico de 2008 a 2010*, publicada en febrero de 2013 por el Centro de Datos Censales, Escuela de Salud Pública, Recinto de Ciencias Médicas, Universidad de Puerto Rico, Apéndice de la Petición de *certiorari*, pág. 221.

[5] Como explicaremos más adelante, el único beneficio marginal que perdió el peticionario consiste en un auto que le brindaba la Cooperativa, lo cual se traducía a un 8% adicional de su salario base.

[6] Apéndice de la Petición de *certiorari*, pág. 277.

Actuario Consultor, el perito del señor Santiago Ortiz debió utilizar $4,539 mensuales para el cómputo del plan de retiro.

Ahora bien, en lo que atañe a la perspectiva del perito de la Cooperativa, el tribunal de instancia determinó que la Certificación Actuarial que presentó la Cooperativa carecía de elementos de confiabilidad. Razonó que, a pesar de que la Actuario Consultor acreditó en el documento que revisó los datos y los beneficios del peticionario sometidos por el Departamento de Recursos Humanos de Real Legacy y que estuvo de acuerdo con los beneficios que la compañía determinó para el señor Santiago Ortiz, tal información acreditativa no se presentó como prueba ante la sala de instancia. Asimismo, el foro de instancia dispuso que:

> [El] valor de $4,539.00 consiste en la cantidad que le informa Carmen A. Estarellas, sic. Actuario Consultor, en cuanto a lo que recibía el querellante luego de la enmienda del plan de 2015. No obstante, este Tribunal no acoge esta interpretación, ya que **según los hechos probados y recogidos en est[a] sentencia, al querellante <u>nunca le fue notificado dicho cambio</u>**. Tomamos en consideración que **para el 2015 el querellante estaba recibiendo una pensión, que se debió única y exclusivamente a que fue despedido de forma injustificada y discriminatoria y que al quedarse sin fuente de ingreso se vio obligado a adelantar su plan de retiro y a retirar su plan de ahorros 401k, por lo que de no haber ocurrido el despido, el querellante no hubiese tomado por adelantado su participación en el plan ni retirado sus ahorros del 401k**. [...].(Énfasis suplido).[7]

En lo concerniente a la **falta de notificación de la enmienda al plan de retiro,** la señora Rincón Vela testificó que su asesor legal le indicó que no tenía que notificarle al peticionario del cambio porque éste no era empleado, por ende, tampoco un participante activo que, además, recibía pensión

---

[7] Apéndice de la Petición de *certiorari*, pág. 277.

antes de que cobrara vigencia la modificación en el plan de retiro. La consabida enmienda consistió en la congelación total de la acumulación de salarios y de los años de servicio. Así que, a partir del 1 de enero de 2016, ningún participante tendría una acumulación adicional. El tribunal de instancia le restó credibilidad a ese testimonio porque, según la sección 204(h) del *Employee Retirement Income Security Act*, conocida como ERISA, 26 CFR 54.498-f-1 (ERISA) las notificaciones deberán hacerse a toda persona perjudicada o que se le alteren sustancialmente sus beneficios en el plan.

En resumen, el tribunal de instancia acogió la opinión del perito del peticionario y, conforme a ello, determinó que:

> [E]l salario dejado de devengar por el querellante suma $538,725.51 (valor presente) y en cuanto al plan de retiro dejado de recibir la cantidad de $280,841.96 (valor presente) para un gran total de $819,567.47. La suma anterior multiplicad[a] por dos según lo dispone la Ley [Núm.] 100, supra, equivale a $1,639,134.94. **Es importante destacar que si antes de evaluar la ecuación del doble de los daños rebajamos las cantidades que recibió el querellante por concepto de mesada al amparo de la Ley [Núm.] 80, supra, el efecto práctico en la sumatoria, sería que también estaríamos duplicando dichas cantidades**.(Énfasis suplido).[8]

En cuanto a las **angustias mentales sufridas por el señor Santiago Ortiz**, el tribunal de instancia las valoró en $65,000, cantidad que luego duplicó al amparo de la Ley 100,*supra*, para una compensación de $130,000. En síntesis, el foro de instancia entendió que, conforme a la nota al calce núm. 5 de Soc. de Gananciales v. Centro Gráfico, 144 DPR 952, 965 (1998), debía restar la mesada luego de imponer la doble

---

[8] Apéndice de Petición de *certiorari*, pág. 290.

penalidad de la        Ley 100, *supra*. La sala de instancia calculó la compensación final de la manera siguiente:

| CONCEPTO | CANTIDAD |
|---|---|
| Salario dejado de percibir (valor presente) | $538,725.51 |
| Plan de retiro dejado de percibir (valor presente) | + $280,841.96 |
| Sub total | $819,567.47 |
| Doble penalidad de la Ley 100 | x        2 |
| Sub total | $1,639,134.94 |
| Angustias mentales ($65,000 x Doble penalidad) | + $130,000.00 |
| Sub total | $1,769,134.94 |
| Mesada por despido injustificado más intereses[9] | $274,501.26 |
| Liquidación de vacaciones | $18,000.00 |
| Liquidación del plan 401K | $70,000.00 |
| Pensión prematura recibida por el peticionario ($3,057 x 4 meses) | - $12,228.00 |
| **Compensación final** | **$1,394,405.68** |

A raíz del dictamen, la Cooperativa acudió al Tribunal de Apelaciones para cuestionar la apreciación de la prueba, así como la adjudicación de los hechos y la aplicación del derecho realizada por el tribunal de instancia. Luego de la comparecencia de ambas partes y de la presentación de la transcripción de la prueba oral, el foro apelativo intermedio dictó una *Sentencia* en la que modificó las sumas concedidas por el foro de instancia y, así modificada, confirmó el dictamen. El tribunal apelativo intermedio razonó que el foro de instancia cometió varios errores.

---

[9] Cabe señalar que surge de la *Sentencia* que la Cooperativa entregó el pago por concepto de mesada entre finales de octubre y principios de noviembre de 2016 y, posteriormente, pagó $9,706.38 en concepto de intereses legales. Es decir, entre la mesada y los intereses legales, la Cooperativa le pagó al peticionario $274,501.26.

Primero, consideró que la sala de instancia erró al descartar el testimonio del perito de la Cooperativa ya que era un hecho incontrovertible que a partir del 1 de enero de 2016 el beneficio del plan de retiro quedó congelado. Asimismo, el foro apelativo intermedio razonó que la pérdida de ingreso por concepto de pensión por $10,169.41 mensuales que el perito del señor Santiago Ortiz calculó no se ajustó a la realidad e ignoró por completo la congelación del plan de retiro. Además, dispuso que ese cómputo sobrestimó la pérdida de ingresos por concepto de pensión.

Cónsono con lo anterior, el tribunal apelativo intermedio discrepó de la determinación del foro de instancia en cuanto al deber de la Cooperativa de notificar al señor Santiago Ortiz los cambios del plan de retiro. El desacuerdo se cimentó en que, según el testimonio de la señora Rincón Vela y las disposiciones del ERISA, *supra*, al señor Santiago Ortiz no había que notificarle 45 días previos a la enmienda del plan de retiro porque ese requerimiento era solo para participantes activos del plan y el peticionario, al 31 de diciembre de 2015, recibía mensualmente su retiro.

Por otro lado, contrario al tribunal de instancia, el foro apelativo intermedio quedó convencido del *Reporte escrito Ley 80 & Ley 100* (Informe) del perito de la Cooperativa al concluir que el peticionario tuvo una pérdida combinada de lucro cesante y de pensión de $476,630.90. A esta cantidad, el perito de la Cooperativa le restó $274,501.26 por concepto del pago de la mesada más

intereses. Con esta operación aritmética se obtiene un total de $202,129.64 que, según el referido perito, el valor presente de esa cantidad es $21,525.33.

Asimismo, el Tribunal de Apelaciones subrayó que la partida de angustias mentales por $65,000 concedida al señor Santiago Ortiz no cumplió con el ejercicio de valoración que los tribunales tienen que realizar conforme a la jurisprudencia de este Tribunal. Así, después de realizar el ejercicio de valoración, modificó la cuantía concedida por angustias mentales a $35,000.

Ahora bien, a los daños que el foro apelativo intermedio adjudicó le sustrajo la mesada que el señor Santiago Ortiz recibió antes de la *Sentencia* y, a ese resultado, entonces, aplicó la doble penalidad de la Ley 100, *supra*. El Tribunal de Apelaciones señaló que el método utilizado por el foro de instancia no era el correcto porque de <u>Odriozola v. Cosmetics Dist. Corp.</u>, 116 DPR 485 (1985) surge la fórmula para calcular la compensación final en un caso al amparo de la Ley 100, *supra*. De manera que, según la interpretación del foro apelativo intermedio, el cómputo de la compensación final del señor Santiago Ortiz debía ser el siguiente:

| CONCEPTO | CANTIDAD |
|---|---|
| Salario dejado de devengar Y plan de retiro (valor presente) | $476,630.90 |
| Mesada por despido injustificado más intereses | - $274,501.26 |
| Sub total | $202,129.64 |

Según el informe del perito de la Cooperativa,
**el valor presente de $202,129.64**                        $21,525.33
Angustias mentales                                         + $35,000.00

                                   Sub total                  $56,525.33
Doble penalidad de la Ley 100                             x          2
                                   **Compensación final**    **$113,050.66**

Finalmente, coincidió con el foro de instancia respecto a la imposición del 15% en honorarios de abogado. No obstante, la cuantía quedó modificada luego de que el Tribunal de Apelaciones acogiera la prueba pericial, documental y testimonial de la Cooperativa. Es decir, al multiplicar $56,525.33 de compensación base por el 15%, los honorarios de abogado resultaron en $8,478.80.

En desacuerdo, el peticionario presentó el recurso que nos ocupa. En éste señaló que el Tribunal de Apelaciones erró en la aplicación del derecho vigente, en la adjudicación de los daños al amparo de la Ley 100, *supra*, y, en consecuencia, al modificar el dictamen.

El 6 diciembre de 2019 expedimos el recurso de certiorari solicitado. Contamos con la comparecencia de ambas partes, por lo que estamos listos para resolver.

II

A. Procedimiento sumario de la Ley 2

La Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA 3118 *et seq.* (Ley 2) establece un mecanismo expedito para lograr "la rápida consideración y adjudicación de las querellas presentadas por los obreros o empleados, principalmente en

casos de reclamaciones salariales y beneficios".[10] Al igual que varias leyes laborales, la Ley 80, *supra,* sobre despido injustificado y la Ley 100, *supra*, que proscribe el discrimen por clasificación, se benefician del alcance extendido de la Ley 2, *supra*.[11] Mediante esta herramienta acelerada, la Legislatura creó varias limitaciones procesales, entre las que incluye un plazo corto tanto para la contestación de la querella como para solicitar la prórroga de ésta.[12] De manera que si el patrono no contesta la querella dentro del término de 10 o 15 días, según le corresponda, ni solicita una prórroga juramentada para ello, las Secs. 3 y 4 de la Ley 2, 32 LPRA sec. 3120 y 3121, en síntesis, disponen que, el juez, a instancias de la parte querellante, "dictará sentencia en su contra, concediendo el remedio solicitado, sin más citarle ni oírle". En palabras sencillas, la consecuencia ordinaria de esta inacción es la anotación de la rebeldía al patrono.[13] Sin embargo, este descargue judicial por sí solo no es sinónimo ni garantía de que el tribunal dictará una sentencia a favor del obrero.[14]

---

[10] Medina Nazario v. McNeil Healthcare LLC, 194 DPR 723, 732 (2016) citando Rivera v. Insular Wire Products Corp., 140 DPR 912, 923 (1996).

[11] Ocasio v. Kelly Servs., 163 DPR 653, 666 esc.5 (2005) y Berríos Heredia v. González, 151 DPR 327, 340 (2000) citando a Rivera v. Insular Wire Products Corp., supra.

[12] Patino Chirino v. Parador Villa Antonio, 196 DPR 439, 446 (2016), Rivera v. Insular Wire Products Corp., supra, págs. 923-924.

[13] Vizcarrondo Morales v. MVM, Inc., 174 DPR 921, 935 (2008) y Román Cruz v. Díaz Rifas, 113 DPR 500, 505 (1982) citando a Murphy Lugo v. Atl. Sou. Insurance Co., 91 DPR 335 (1964) y Srio. del Trabajo v. Tribunal Superior, 91 DPR 864 (1965).

[14] Vizcarrondo Morales v. MVM, Inc., supra, pág. 937.

Ahora bien, es norma reiterada que el tribunal sí puede dictar una sentencia en rebeldía cuando el querellante alega correctamente los hechos particulares "los cuales, de su faz, sean demostrativos que, de ser probados, lo hacen acreedor del remedio solicitado".[15]

En contraste, las alegaciones concluyentes, las determinaciones de derecho y los hechos alegados de manera incorrecta son insuficientes para sostener una determinación de responsabilidad del patrono.[16] Asimismo, por más que la parte querellante formule alegaciones de hechos específicos sobre los daños que reclamó, éstos siempre serán objeto de prueba.[17] Para ese cometido, el tribunal de instancia celebrará las vistas necesarias y adecuadas de modo "que el querellante sustente sus alegaciones y pruebe los daños alegados en la querella".[18]

En esta ocasión, ante el incumplimiento de contestar la querella, la Cooperativa carga con el peso del estado de rebeldía impuesto por el mecanismo expedito de la Ley 2, *supra*. En consecuencia, no hubo el proceso probatorio que, de ordinario, requiere una causa de acción que acumule

_____

[15] Ocasio v. Kelly Servs., supra, pág. 673.

[16] Ruiz v. Col. San Agustín, 152 DPR 226, 236 (2000) citando a Continental Ins. Co. v. Isleta Marina, 106 DPR 809, 815 (1978).

[17] Vizcarrondo Morales v. MVM, Inc., supra, citando a Ruiz v. Col. San Agustín, 152 DPR 226, 236 (2000).

[18] Vizcarrondo Morales v. MVM, Inc., pág. 937.

reclamaciones por despido injustificado y discriminatorio.[19] En estas circunstancias, nuestra responsabilidad revisora se circunscribe a la concesión previa de la mesada y a la etapa de la evaluación de la prueba respecto a la causa de acción por discrimen.

B. Indemnizaciones de reclamaciones al amparo de la Ley 80 y de la Ley 100

Sabido es que la mesada es la indemnización a la que un empleado tiene derecho en caso de que sea despedido injustificadamente.[20] El Art. 1 de la Ley 80, *supra*, 29 LPRA sec. 185a, establece la fórmula para computar la mesada, por lo que "de no haber alguna otra causa de acción al amparo de otras leyes que prohíban el despido y concedan otros remedios",[21] ésta constituye el remedio exclusivo para el obrero.[22] La cantidad de la mesada depende de 2 factores: (1) el sueldo del obrero y (2) los años de servicio.[23]

---

[19] Destacamos que, según hemos resuelto, "el proceso probatorio en casos por *despido injustificado y discriminatorio* ventilados al amparo de *ambos estatutos conjuntamente*, a saber la citada Ley Núm. 80 y la Ley Núm. 100, ante, *es uno compuesto por tres (3) turnos de prueba y no de dos (2) como en reclamaciones al amparo de la Ley Núm. 80 únicamente.*" (Énfasis en el original). Díaz v. Wyndham Hotel Corp., 155 DPR 364, 391 (2001).

[20] SLG Pagán-Renta v. Walgreens, 190 DPR 251, 260 (2014).

[21] Romero v. Cabrer Roig, 191 DPR 643, 650 (2014), citando a Vélez Cortés v. Baxter, 179 DPR 455, 465 (2010) citando a García v. Aljoma, 162 DPR 572, 597 (2004).

[22] SLG Pagán-Renta v. Walgreens, supra, pág. 260, citando a Porto y Siruano v. Bentley P.R., Inc., 132 DPR 331, 342 (1992).

[23] Art. 1 de la Ley Núm. 80 de 30 de mayo de 1976 conocida como *Ley de indemnización por despido sin justa causa*, según enmendada, 29 LPRA sec. 185a (Ley 80); Romero v. Cabrer Roig, 191 DPR 643, 650 (2014).

En cuanto a la Ley 100, *supra*, ésta instrumenta los preceptos de raigambre constitucional que rigen el ámbito obrero-patronal para proteger a las personas de todo ataque abusivo contra la honra, la reputación y la vida privada o familiar, así como a los empleados o candidatos contra el discrimen por clasificación, entre las cuales se encuentra el discrimen por edad.[24] El inciso (a)(1) del Art. 1 de la Ley 100, 29 LPRA sec. 146(a)(1), postula que la responsabilidad civil que acarrea el patrono por discriminar en contra de un obrero es "[p]or una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo". Esta compensación obligatoria se conoce típicamente como doble penalidad y abarca tanto los daños económicos como los sufrimientos y angustias mentales que pruebe el promovente.[25]

Vislumbrada las indemnizaciones obligatorias de ambos estatutos, analicemos cómo éstas se relacionan cuando el querellante acumula reclamaciones al amparo de las leyes 80 y 100, *supra*.

En Belk v. Martínez, 146 DPR 215 (1998) una de las controversias que atendimos era si procedía la exclusión de la

---

[24] Art. II, Sec. 1 y 8, Const. ELA, LPRA, Tomo 1. Art. 1-A de la Ley 100 de 30 de junio de 1959, conocida como la *Ley contra el discrimen de empleo*, 29 LPRA sec. 146 *et seq*. (Ley 100); S. L. G. Afanador v. Roger Electric Co., Inc., 156 DPR 651, 661 (2002) y Ramos Pérez v. Univisión, 178 DPR 200, 222 (2010).

[25] S. L. G. Afanador v. Roger Electric Co., Inc., supra, pág. 667. Por otro lado, reconocemos que "el remedio preferente en casos de despido por discrimen [es] la reposición en el empleo, siempre que ello sea posible". Íd., pág. 668 citando a López Vicil v. ITT Intermedia Inc., 142 DPR 857, 866 (1997).

mesada de la Ley 80, *supra*, de la indemnización concedida al amparo de la Ley 100, *supra*. En esa oportunidad reconocimos que la Ley 100, *supra*, compensa los daños sufridos por el empleado y éstos incluyen, además, aquéllos que remedia la mesada regulada por la Ley 80, *supra*.[26] Por lo tanto, salvo contadas excepciones,[27] "[c]onceder una indemnización al amparo de dos (2) leyes distintas que tienen los mismos elementos, criterios y dependen de la misma prueba, penalizaría al patrono dos (2) veces por un s[o]lo acto".[28]

Posteriormente, reiteramos esta normativa en S. L. G. Afanador v. Roger Electric Co., Inc., 156 DPR 651 (2002) al expresar que, en estas circunstancias, la mesada "queda excluida del panorama adjudicativo".[29] Pero, esta exclusión no se da en el vacío, pues indicamos que:

> [C]uando un trabajador es víctima de una violación mayor a un mero despido sin justa causa, las protecciones que le reconocen las disposiciones de legislación social aplicables al caso en particular

---

[26] Belk v. Martínez, 146 DPR 215, 241 (1998).

[27] En C.O.P.R. v. S.P.U., 181 DPR 299, 337-338 (2011), nos expresamos con relación a las instancias en las cuales existen remedios adicionales concurrentemente con la mesada.

> [E]xisten tres excepciones a la norma del remedio único de la mesada, a saber: (1) los remedios adicionales conferidos por conducta torticera del patrono, ajena a la mera violación de una disposición de las leyes del trabajo (*Rivera v. Security Nat. Life Ins. Co.*, supra, pág. 527); (2) los remedios adicionales provistos por leyes especiales (*Vélez Rodríguez v. Pueblo Int'l, Inc.*, supra, pág. 511), y (3) los remedios adicionales concedidos por un despido cuyo propósito e intención principal sea subvertir una clara política pública del Estado o algún derecho constitucional (*Soc. de Gananciales v. Royal Bank de P.R.*, 145 DPR 178, 192 (1998); *Porto y Siurano v. Bentley P.R., Inc.*, 132 DPR 331, 342 (1992); *Arroyo v. Rattan Specialties, Inc.*, 117 DPR 35, 65 (1986)).

[28] Belk v. Martínez, supra.

[29] S. L. G. Afanador v. Roger Electric Co., Inc., supra, págs. 667-668.

> son, asimismo, superiores al remedio de la mesada,
> que constituye la única y exclusiva protección que
> le ampara al empleado que es objeto de un *despido
> injustificado.*(Énfasis en el original).[30]

La pauta de <u>Belk v. Martínez</u>, supra, reiterada en <u>S. L.
G. Afanador v. Roger Electric Co., Inc.</u>, supra, ya la habíamos
implementado en <u>Soc. de Gananciales v. Centro Gráfico</u>, 144 DPR
952, 965 (1998) al enunciar lo siguiente:

> El conceder una indemnización bajo las dos (2) leyes
> en cuestión penalizaría al patrono por un mismo acto
> —el despido injustificado. En estos casos, el
> tribunal de instancia concederá el remedio que
> proceda bajo una u otra ley, **a base de lo que sea
> más beneficioso para la trabajadora**, según la
> prueba, pero la concesión de indemnización bajo la
> Ley Núm. 3, *supra*, excluirá la concesión de
> indemnización bajo la Ley Núm. 80, *supra*, y **lo mismo
> ocurrirá a la inversa.**

Curiosamente, en una nota al calce relacionada a estas
expresiones, expusimos el escenario que sigue:

> Ahora bien, **si ya se ha concedido un remedio dentro
> del mismo pleito bajo cualesquiera de estas leyes**,
> lo que procede no es desestimar la acción en
> relación con la otra, sino atender dicha
> reclamación. **De ésta proceder y el obrero probar que
> le corresponde una cuantía mayor en concepto de
> daños, entonces hay que rebajarle a la compensación
> mayor la cantidad previamente concedida bajo la otra
> ley**. De esta forma se mantiene la exclusividad del
> remedio sin perjudicar los derechos del obrero y se
> fomenta la política pública de promover la concesión
> rápida de remedios económicos en casos laborales.
>
> No obstante, en ningún caso se interpretará lo
> anteriormente señalado como una venia al
> fraccionamiento de las causas de acción en los
> pleitos en los que se reclama bajo distintas leyes
> laborales. (Citas omitidas) (Énfasis nuestro).[31]

Un insumo de lo anterior nos lleva a reiterar, primero,
que "no todo despido injustificado es discriminatorio a su

---

[30] Íd., pág. 668 esc. 10.

[31] <u>Soc. de Gananciales v. Centro Gráfico</u>, 144 DPR 952, 965 esc. 5 (1998).

vez; y, por el contrario, todo despido discriminatorio sí es injustificado".[32] Asimismo, de ordinario, la Ley 100, *supra*, y su progenie,[33] extienden una mayor compensación que la ofrecida por la mesada regulada por la Ley 80, *supra*. Como mencionáramos, si el tribunal determina que el despido resultó injustificado, el remedio exclusivo será la mesada, cuyo cómputo está sujeto al sueldo y a los años de servicio del empleado.[34] Después de adjudicado el discrimen, la doble penalidad de la Ley 100, *supra*, abarca los daños patrimoniales y las angustias mentales. En cuanto a este último aspecto y, "tratándose de componentes distintos a ser indemnizados, *los daños económicos no absorben los emocionales*". (Énfasis en el original).[35] En caso de la concurrencia de acciones, sólo procederá aquella indemnización estatutaria que ofrezca una mayor compensación al obrero. Finalmente, si dentro del mismo pleito el tribunal concede al promovente un remedio al amparo de la Ley 80, *supra*, o la           Ley 100, *supra*, (o sus estatutos germanos), se atenderá la reclamación pendiente. Si ésta procede y se demuestra que al obrero "le corresponde una cuantía mayor en concepto de daños, entonces hay que rebajarle

---

[32] Díaz v. Wyndham Hotel Corp., supra, pág. 387.

[33] Véanse, por ejemplo, Ley Núm. 17 de 22 de abril de 1988, conocida como *Ley para prohibir el hostigamiento sexual en el empleo*, 29 LPRA sec. 155 *et seq.*;           Ley Núm. 3 de 13 de marzo de 1942, conocida como *Ley de protección de madres obreras*, 29 LPRA sec. 467 *et seq.*

[34] Claro está, a menos que apliquen las excepciones indicadas en C.O.P.R. v. S.P.U., supra. Véase, nota al calce núm. 27.

[35] S. L. G. Afanador v. Roger Electric Co., Inc., supra, pág. 667 citando a García Pagan v. Shiley Caribbean, etc., 122 DPR 193, 212 (1988).

a la compensación mayor la cantidad previamente concedida bajo la otra ley".[36]

**Sin embargo, el problema no está en que el tribunal rebaje aquella indemnización -de menor cuantía- recibida o adjudicada dentro del mismo pleito regulada por una de las leyes bajo las cuales el querellante presentó la causa de acción. La cuestión por resolver es conocer ¿cuál es la fórmula matemática que los tribunales utilizarán cuando, ante un caso por despido injustificado y discriminatorio, la mayor cuantía proviene de una legislación laboral que impone la doble penalidad? Es decir, en este caso, ¿cuándo restamos la mesada que resultó de menor cantidad de la adjudicada por Ley 100, *supra*, antes o después de la imposición de la doble penalidad?**

Para responder estas preguntas, partimos de la premisa de que "en el caso particular de [la] legislación cuyo fin primordial es remediar los efectos adversos de una actuación inconstitucional, debemos favorecer una interpretación que resulte en una mejor protección de los derechos humanos".[37] Recuérdese, además, que "el propósito del legislador [al aprobar la Ley 100, *supra*,] fue establecer una fórmula para reparar los daños causados por el discrimen en el empleo. Aunque [-en estos casos-] la Constitución es la fuente de remedios, **el estatuto provee la medida en que los daños han de**

---

[36] Soc. de Gananciales v. Centro Gráfico, supra.

[37] García Pagán v. Shiley Caribbean, etc., 122 DPR 193, 209 (1988).

**ser resarcidos**". (Énfasis suplido).[38] No olvidemos que "[u]n estatuto reparador o remedial es aquel que establece 'acciones o mecanismos dirigidos a reparar [actos] ilícitos o proteger derechos prexistentes'".[39] Cuando analizamos un estatuto de manera armoniosa con el propósito que persigue la ley se evitan "interpretaciones que conduzcan a resultados irrazonables o absurdos, o que den lugar a distinciones que carezcan de fundamento racional".[40]

La Ley 100, *supra*, procura reparar agravios de entronque constitucional y, según el estatuto, la doble penalidad en los daños es una responsabilidad de carácter civil que incurre el patrono por actuar discriminatoriamente en contra de un empleado o solicitante de empleo. Dicho de otro modo, la medida para resarcir los daños no es la suma que, conforme a la prueba desfilada, el tribunal adjudica, sino que la doble penalidad que impone la Ley 100, *supra*, es la que imparte una mayor compensación a la cuantía concedida. **De manera que, ante una reclamación al amparo de un precepto legal como la Ley 100, *supra*, la mayor indemnización otorgada en daños es con inclusión de la doble penalidad que la legislación social impone**. Esta interpretación es afín con el propósito de la Ley 100, *supra*, pues extiende una mejor protección de los derechos humanos ante el atropello discriminatorio y, por ende, injustificado.

---

[38] Íd., pág. 211.

[39] Hernández v. Mun. de Aguadilla, 154 DPR 199, 205, esc. 4 (2001).

[40] Díaz v. Wyndham Hotel Corp., 155 DPR 364, 389 (2001) citando García Pagán v. Shiley Caribbean, etc., supra, pág. 202.

**Por lo tanto, resolvemos que ante una reclamación por la Ley 80, *supra*, y por Ley 100, *supra*, o una medida obrero-patronal que incluya la doble penalidad como resarcimiento y proceda la deducción de la mesada, ésta se hará luego de implementar la doble penalidad de la legislación social.** Decir lo contrario tendría el efecto de duplicar la cantidad rebajada al momento de imponer la doble penalidad lo que, a su vez, constituiría un castigo al obrero por haber recibido o el tribunal haberle adjudicado una indemnización al amparo de una ley distinta de la que provee un resarcimiento más beneficioso. Al mismo tiempo, lejos de procurar la coherencia con esta legislación protectora, conduciría a los "resultados irrazonables o absurdos, o que [dan] lugar a distinciones que care[cen] de fundamento racional", cosa que estamos llamados a evitar.[41] Por último, interpretarlo así sería antagónico a la política pública que postulan las leyes laborales en nuestra jurisdicción: proteger al obrero o candidato a un empleo de las acciones ilegales de los patronos.

Sin entrar aún en las cantidades, precisamente lo antes señalado ocurrió en el caso de autos. El Tribunal de Apelaciones expuso que, según <u>Odriozola v. Cosmetics Dist. Corp.</u>, *supra*, la operación matemática correcta para obtener la indemnización final era restar la mesada antes de imponer la doble penalidad de la Ley 100, *supra*. Por lo que ya hemos

---

[41] <u>Díaz v. Wyndham Hotel Corp.</u>, supra, pág. 389 citando <u>García Pagán v. Shiley Caribbean, etc.</u>, supra, pág. 202.

concluido, tal interpretación de nuestro precedente es incorrecta.

En primer lugar, el referido caso se presentó **<u>únicamente</u>** al amparo de la Ley 100, *supra*. En aquella ocasión hicimos referencia al cálculo aritmético que realizó la sala de instancia para atender la controversia sobre el derecho a la compensación por ingresos futuros (*front pay*) que pudiera devengar una persona hasta la edad de retiro y, en consecuencia, confirmar la cuantía que el foro de instancia había concedido en daños. Contrario a la interpretación que el tribunal apelativo intermedio enunció en el caso que nos ocupa, el ejercicio que formuló el tribunal de instancia antes de imponer la doble penalidad de la Ley 100, *supra*, en <u>Odriozola v. Cosmetics Dist. Corp.</u>, supra, era necesario para obtener lo que constituiría la pérdida neta de ingresos futuros del Sr. José P. Odriozola (señor Odriozola).[42] A raíz de los argumentos del señor Odriozola, resolvimos que "los ingresos futuros calculados hasta la edad de retiro son una parte indispensable de la justa compensación a que el empleado discriminado por edad tiene derecho".[43] En fin, reiteramos que

---

[42] En esencia, antes de imponer la doble penalidad en <u>Odriozola v. Cosmetics Dist. Corp.</u>, 116 DPR 485 (1985), el tribunal de instancia realizó un ajuste a base de las estadísticas oficiales de probabilidad que tenía el demandante de obtener un empleo durante el periodo que le restaba para alcanzar la edad de retiro. Esa deducción era imperativa para obtener la cantidad que representaría la pérdida neta de ingresos futuros (*front pay*) del Sr. José P. Odriozola (señor Odriozola). A ese *front pay*, el foro de instancia le sumó la pérdida de los ingresos desde el despido hasta la sentencia o dejados de devengar (*back pay*) y al resultado, entonces, le aplicó la doble penalidad de la Ley 100, *supra*. <u>Odriozola v. Cosmetics Dist. Corp.</u>, supra, págs. 508-509.

[43] <u>Odriozola v. Cosmetics Dist. Corp.</u>, supra, pág. 510.

la deducción ejecutada **no se trató de una indemnización al amparo de otra ley, sino una de naturaleza distinta a la del caso de autos.**

Disipada la controversia con relación a la ecuación, tenemos otro asunto que debemos dilucidar. Como foro revisor, existe la "obligación de velar porque se haga justicia a aquella parte que de acuerdo [con] nuestro más sano criterio tiene derecho a ella".[44] Por eso, cuando el derecho le asiste a una parte, este Tribunal puede atender señalamientos de error que no fueron argumentados.[45]

C. Otras deducciones

Aquí el foro de instancia cometió un error de Derecho que el peticionario no argumentó ante el foro apelativo intermedio, que no podemos pasar por alto porque, en efecto, incidió en la apreciación de la prueba y se reflejó en la modificación de la *Sentencia* por parte del Tribunal de Apelaciones. En esta ocasión nuestra intervención es necesaria, para proveer un remedio completo en el caso de epígrafe.[46]

El tribunal de instancia, luego de imponerle la doble penalidad a la compensación final le restó los pagos que la

---

[44] López Vicil v. ITT Intermedia Inc., supra, pág. 867, citando Ríos Quiñones v. Adm. Servs. Agrícolas, 140 DPR 868 (1996); Rodríguez Cruz v. Padilla Ayala, 125 DPR 486 (1990); Ab Intestato Marini Pabón, 107 DPR 433 (1978); Santiago Cruz v. Hernández Andino, 91 DPR 709 (1965); Dávila v. Valdejully, 84 DPR 101 (1961); Coll v. Picó, 82 DPR 27 (1960); Cruz v. Bruno, 76 DPR 966 (1954).

[45] Íd.

[46] López Vicil v. ITT Intermedia Inc., supra, pág. 867.

Cooperativa le entregó al peticionario en concepto de liquidación de vacaciones ($18,000), plan de ahorros o 401K ($70,000) y del pago de la pensión prematura recibida por el peticionario ($12,228). Sobre este particular es necesario señalar nuestros pronunciamientos en Hernández v. Mun. de Aguadilla, 154 DPR 199, 209 (2001) reiterados recientemente en Raúl Zambrana García v. ELA, 2020 TSPR 47 de que "solo se descuentan de la compensación aquellos ingresos que sustituyeron los que el empleado habría percibido de su antiguo empleo si no hubiese sido cesanteado". En palabras sencillas, se descontará de la compensación los ingresos por trabajos que el obrero obtuvo y realizó luego del despido.[47]

En lo concerniente a las vacaciones no nos hemos pronunciado de que la paga por ese concepto constituya una remuneración por trabajo realizado, más bien hemos expresado que:

> Reconocemos la afinidad entre tales pagos y el trabajo realizado ya que no habría derecho a vacaciones si no se realiza trabajo. Sin embargo, el vínculo entre uno y otro concepto no altera el principio esencial de que **sólo el trabajo realizado mediante el esfuerzo físico o intelectual es compensable con la indemnización o penalidad adicional**. Esta norma no queda afectada por la amplitud retórica que pueda atribuirse al vocablo 'salarios'.[48]

---

[47] Raúl Zambrana García v. ELA, 2020 TSPR 47.

[48] J.R.T. v. Ventanas Yagüez, Inc., 103 DPR 933, 938 (1975). Destacamos que el caso resolvió la inaplicabilidad de la doble penalidad a las vacaciones acumuladas que se atendió en el contexto de la Ley Núm. 379 de 15 de mayo de 1948, según enmendada, conocida como *Ley para Establecer la Jornada de Trabajo en Puerto Rico*, 29 LPRA sec. 271, *et seq.*

Por otro lado, es conocido que la doctrina de la fuente colateral (*collateral source doctrine*) "impide al causante de un daño deducir del importe de la indemnización de la cual responde, la compensación o beneficios que haya recibido el perjudicado de una tercera persona o entidad, esto es, de una fuente no relacionada con el demandado".[49] En Futurama Import Corp. V. Trans. Caribbean, 104 DPR 609 (1976), además de reiterar la existencia de la doctrina en nuestra jurisdicción, expresamos que "el pago de los salarios durante vacaciones o enfermedad del empleado se reconoce por razones distintas a las que dan lugar a una compensación por negligencia".[50]

Obsérvese que si en J.R.T. v. Ventanas Yagüez, Inc., 103 DPR 933 (1975) reconocimos que las vacaciones no se consideran una compensación por trabajo realizado y resolvimos la inaplicabilidad de la imposición de la doble penalidad de una legislación social, por la misma razón no debe ser deducida de una indemnización como si constituyera un ingreso recibido luego de que el patrono haya despedido al empleado.[51] No podemos convertir una legislación llamada

---

[49] Futurama Import Corp. V. Trans. Caribbean, 104 DPR 609, 611-612 (1976).

[50] Futurama Import Corp. v. Trans. Caribbean, 104 DPR 609, 612 (1976). Es menester mencionar que en este caso resolvimos que la doctrina de la fuente colateral no se podía aplicar de manera automática. De manera que para conocer si se debía restar o no el beneficio de la indemnización, es necesario evaluar caso a caso tanto el origen como el propósito del beneficio de que se trate. Véase además, Nieves Cruz v. Universidad de Puerto Rico, 151 DPR 150 (2000).

[51] J.R.T. v. Ventanas Yagüez, Inc., supra, págs. 937-938.

a favorecer al empleado en un privilegio para el patrono.[52]
El pago de salarios por vacaciones al igual que la
enfermedad no constituyen *per se* una compensación.[53] Por lo
tanto, no deben ser deducidas de la indemnización de un
caso de daños al amparo de la Ley 100, *supra*.

Esta apreciación es similar a las expresiones que el
Tribunal Federal para el Distrito de Puerto Rico ha
esbozado en torno a las deducciones realizadas en
escenarios que involucran un despido. En específico, en
Toro v. Sánchez, 141 F.Supp. 2d 195, 196 (2001) el foro
federal en Puerto Rico expresó lo siguiente:

> Traditionally the rule that collateral
> benefits are not subtracted from the plaintiff's
> award of damages has been applied to benefits paid
> under: (1) an insurance policy or by a relief
> association; (2) **employment benefits**; (3)
> gratuitous payments; (4) social legislation
> benefits such as social security, welfare,
> **pensions**; and (4) **benefits received under certain
> retirement acts**. The basic argument advanced for
> the rule's application is that a tort-feasor
> should not be allowed to escape the consequences
> of his wrongful act merely because his/her victim
> has received a benefit from a collateral source
> which would constitute a windfall to the defendant
> wrongdoer. Another argument in its favor is that
> in many instances **the plaintiff has paid for these
> benefits in the form of** insurance premiums or
> **concessions in the wages he received because of
> such fringe benefits**. (Énfasis nuestro).[54]

En consideración a lo anterior entendemos que, a pesar
de que el Tribunal de Apelaciones implementó erróneamente el
cálculo matemático discutido, sí actuó correctamente al no

---

[52] García Pagan v. Shiley Caribbean, etc., supra, pág. 212.

[53] Futurama Import Corp. v. Trans. Caribbean, supra, pág. 612.

[54] Toro v. Sánchez, 141 F.Supp. 2d 195, 196 (2001).

restar las partidas de liquidación por vacaciones, el pago por pensión prematura ni del plan de ahorro que retiró el peticionario.

Precisamente, para implementar la norma referente a la fórmula aritmética adoptada con las partidas correspondientes nos toca además evaluar la apreciación de la prueba pericial y documental que examinaron los foros *a quo* en el caso que nos ocupa.

D. Apreciación de la prueba documental y pericial

Es norma reiterada que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el tribunal de primera instancia.[55] En ese contexto, la llamada deferencia judicial está predicada en que los jueces de las salas de instancia están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo.[56] Pero si la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la evaluación se distancie de la realidad fáctica o ésta es inherentemente imposible o increíble tenemos la responsabilidad ineludible de intervenir.[57]

---

[55] González Hernández v. González Hernández, 181 DPR 746, 776-777 (2011).

[56] Meléndez Vega v. El Vocero de PR, 189 DPR 123, 142 (2013).

[57] González Hernández v. González Hernández, supra, pág. 777; Pueblo v. Santiago et al., 176 DPR 133, 148 (2009).

Por otro lado, cuando las conclusiones de hechos se fundamentan en prueba documental o pericial, es norma establecida que el tribunal revisor se encuentra en igual posición que el tribunal sentenciador para evaluarla.[58] Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta".[59] Todo, con el fin de proveer el justo valor probatorio.[60]

III

Surgen del expediente varios hechos incontrovertibles. Primero, el señor Santiago Ortiz laboró en la Cooperativa desde el 18 octubre de 1993 al 6 de mayo de 2014. Es decir, casi 20 años. Al momento del despido, el peticionario tenía 55 años y generaba un ingreso de $136,845.80 anuales más los beneficios marginales que representaban el 8% ($10,947.66) del salario anual para un total de $147,793.46. El peticionario disfrutaba de días de vacaciones, días por enfermedad, bono de Navidad y de productividad, plan de pensión, uso de automóvil provisto por la compañía, mantenimiento y gasolina del vehículo. Tras su despido, y debido a sus responsabilidades económicas, solicitó la liquidación del plan de ahorro o 401k y se acogió al plan de

---

[58] Rodríguez Cancel v. AEE, 116 DPR 443, 450 (1985).

[59] González Hernández v. González Hernández, supra.

[60] Dye-Tex PR., Inc., v. Royal Ins. Co., 150 DPR 658, 662 (2000).

retiro temprano de la Cooperativa cuya participación data de 1 de julio de 1994.

Luego de 8 meses desempleado, el peticionario obtuvo un empleo en Marsh Saldaña, Inc. (Marsh Saldaña) con un salario anual de $90,000, bono de Navidad por $600, elegibilidad para recibir bono de producción, asignación de celular, computadora corporativa y póliza de seguro grupal, entre otros. Sin embargo, contrario a la Cooperativa, Marsh Saldaña no le ofreció el beneficio del automóvil. En lo concerniente a esta partida, aunque la valoraron en cantidades distintas, ambos peritos reconocieron esta pérdida en sus cálculos.[61]

La prueba documental demuestra que no había tanta diferencia entre las cantidades producto del cálculo de lucro cesante que realizaron los peritos. Éstas estuvieron consideradas sobre la base de si el señor Santiago Ortiz no hubiese sido despedido de la Cooperativa y hubiese permanecido hasta los 65 años. Es decir, desde el 1 de mayo de 2014 hasta el 31 de diciembre de 2023. De manera que, sin incluir el valor presente, el perito del señor Santiago Ortiz concluyó que la sumatoria del lucro cesante sobre el salario anual con inclusión del 8% de los beneficios marginales que tenía en la Cooperativa resultó en $1,511,335.70. Mientras, la misma operación para el perito de la Cooperativa sumó $1,497,461.68.

Por otro lado, los peritos coincidieron con exactitud en lo ateniente a los salarios y beneficios que en la

---

[61] *Transcripción de la prueba oral* (TPO), Apéndice de la Petición de *certiorari*, pág. 496 línea 15 a pág. 499 línea 2 y pág. 618 línea 17 a pág. 619 línea 9.

actualidad posee el señor Santiago Ortiz en Marsh Saldaña, éstos, proyectados hasta la edad de retiro, ascendieron a $889,227.59. Verdaderamente, el hecho de que el señor Santiago Ortiz haya obtenido un empleo a su edad, luego de transcurrido 8 meses de haber sido despedido, sin lugar a duda demostró que el peticionario llevó a cabo acciones afirmativas para mitigar los daños.[62]

Ahora bien, la prueba pericial chocó con la implementación de la metodología para establecer el valor presente de la pérdida de ingresos y la pensión. El perito del señor Santiago Ortiz computó por separado tanto la partida de lucro cesante como la concerniente a la pensión. Entretanto, el perito de la parte de la Cooperativa valoró las referidas partidas en conjunto como una pérdida combinada que discutiremos más adelante.

Como indicamos, el perito del señor Santiago Ortiz computó por separado el lucro cesante y la pensión desde el despido hasta los 65 años. En cuanto al lucro cesante, el experto lo calculó tanto si el peticionario hubiese permanecido trabajando para la Cooperativa ($1,511,335.70) como de su empleo actual en Marsh Saldaña ($889,227.59). Así, la resta del lucro cesante de ambos salarios produjo $622,108.13 que, una vez transformada esa cantidad al valor presente, resultó en $538,726.51.

En lo concerniente a la pensión, el experto la calculó desde los 65 hasta los 81 años, según la expectativa de vida

---

[62] Odriozola v. Cosmetics Dist. Corp., supra, pág. 506-507.

esperada para el señor Santiago Ortiz.[63] Para ello, además, consideró la Certificación de participación que la Cooperativa le entregó al peticionario en el 2010. El cómputo sobre los $10,169.41 mensuales desde la edad de retiro hasta los 81 años produjo $1,962,696.13. A esta cantidad le dedujo los $938,499 correspondientes a la pensión prematura que el peticionario **estaba recibiendo y que continuaría recibiendo**, desde los 55 hasta los 81 años. El remanente de esta operación aritmética ($1,962,696.13 - $938,499) produjo $1,024,197.13 cuyo valor presente dio $280,841.96. Este resultado, según el perito del peticionario, constituiría la pérdida de ingresos por pensión.

Por otro lado, antes de exponer la metodología del perito de la Cooperativa respecto a la pérdida combinada, es necesario expresarnos sobre las discrepancias en cuanto a la prueba documental y pericial para calcular la pensión de retiro del señor Santiago Ortiz.

El récord revela que cuando Real Legacy expidió la Certificación de participación para el peticionario, éste llevaba 16 años participando del beneficio de la compañía. La estimación es clara al disponer que, a los 65 años, el señor Santiago Ortiz recibiría $10,169.41 mensuales a través del plan de retiro. Sin embargo, la postura del perito de la Cooperativa y acogida por el foro apelativo intermedio respecto a que la Actuario Consultor certificó que al peticionario le correspondía recibir $4,539 mensuales a la edad de retiro y que ésta era la cantidad que el perito del

---

[63] Recalcamos que ambos peritos coincidieron en que la expectativa de vida era hasta de 81 años.

señor Santiago Ortiz debía considerar nos resulta inconcebible. Veamos.

Primero, cuando el perito del señor Santiago Ortiz preparó su Informe el 30 de enero de 2017 todavía la Actuario Consultor no había hecho la Certificación Actuarial (15 de marzo de 2017), por lo que en ese momento era imposible que el perito del señor Santiago Ortiz pudiera considerar ese estimado.[64] Aun si creyéramos que el perito del señor Santiago Ortiz pudo haber obtenido la Certificación Actuarial para calcular la pensión basado en los $4,539 mensuales de jubilación, no existe prueba sobre la documentación que revisó la Actuario Consultor. No tenemos forma de validar cómo ésta preparó la Certificación Actuarial ni cómo determinó que el señor Santiago Ortiz debía recibir $4,539 mensuales una vez cumpliera 65 años. Además, tampoco la Actuario Consultor fue parte de la prueba testifical.

Incluso, cuando evaluamos detenidamente tanto la carta de la Actuario Consultor como la Certificación Actuarial anejada observamos que, entre las cosas que ésta presumió para estimar los beneficios de pensión que el señor Santiago Ortiz estaba supuesto a recibir —a partir de 1 de enero de 2016— de no haber sido despedido, era que éste **terminó su empleo el 31**

---

[64] Según surge del expediente del caso de autos, el *Informe pericial sobre reclamación de pérdida económica* lo preparó el CPA Bernardo Bravo (perito del señor Santiago o CPA Bravo) el 30 de enero de 2017 para ser utilizado en la vista que, en aquel momento, estuvo señalada para el 16 de marzo de 2017. Luego de que la Actuario Consultor preparara el Certificado Actuarial el 15 de marzo de 2017, entonces el señor Jorge A. Rodríguez Suárez (perito de la Cooperativa) preparó su *Reporte escrito Ley 80 & Ley 100* (Informe) el 3 de mayo de 2017.

**de diciembre de 2015.**[65] A su vez, que el peticionario no recibió una remuneración especial ni bono de desempeño en exceso del 10% del salario base **durante los 10 años previos al 31 de diciembre de 2015.** Asimismo, las edades se calcularon según el método del tiempo transcurrido **utilizado por el actuario anterior.** Finalmente, las disposiciones del plan vigente son las del documento del plan enmendado y **confirmado el 1 de enero de 2006, y posteriormente modificado el 7 de septiembre de 2011, el 28 de agosto de 2013 y el 30 de junio de 2015.**[66] Nada de esto se presentó ante el foro de instancia.

En segundo término, lo anterior incide sobre el deber de **notificar las modificaciones del plan de retiro de la Cooperativa.** El testimonio del perito de la Cooperativa reveló que, al momento de preparar el Informe, se reunió con

---

[65] Si para calcular la pensión se estimaba que el señor Santiago Ortiz no resultó despedido sino que continuó laborando en la Cooperativa, la Actuario Consultor debió incluir la fecha del retiro como el día de la terminación de empleo y no cuando se congeló el plan.

[66] La carta sobre el estimado de beneficios que la Actuario Consultor dirigió a la Sra. Carmen Ayala el 15 de marzo de 2017 indicaba lo siguiente:

> For these estimates, we have assumed that:
> - Mr. Santiago terminated employment on December 31, 2015.
> - […]
> - Mr. Santiago did not receive any special remuneration, or performance bonuses in excess of 10% of base salary, during the 10 year period prior to December 21, 2015
> - […]
> - […]
> - […]
> - Ages are calculated based on the elapsed time method used by the previous actuary
> - The plan provisions in effect are those of the plan document amended and restated January 1, 2006, and further amended September 7, 2011, August 28, 2013 and June 30, 2015

Véase, Apéndice de la Petición de *certiorari*, pág. 222.

representantes de la Cooperativa y preguntó si el Certificado de participación que la compañía le entregó al peticionario en el 2010 estaba correcto. Estos representantes, según afirmó el experto, aseguraron que **no porque el plan de pensión había sufrido cambios <u>desde antes de que el señor Santiago Ortiz dejara de trabajar para la Cooperativa</u>**.[67] De manera que, es forzoso concluir, tal como el foro de instancia lo hizo, que durante la vida laboral del señor Santiago Ortiz en la Cooperativa, ésta nunca le notificó los cambios que realizó en el plan de retiro.[68] Los cambios realizados bien pudieron haber perjudicado al peticionario desde antes del despido, pero reflejarse sustancialmente luego de que la Cooperativa le expidiera la Certificación de participación. De no haber sido por las vistas sobre la cuantía en daños, el señor Santiago Ortiz jamás se hubiese enterado de cualquier discrepancia con relación a lo que él entendía que debía recibir en concepto de retiro y a lo que la Cooperativa consideraba que le adeudaría al peticionario. En consecuencia, el foro de instancia no erró al interpretar que en este caso la Cooperativa falló en demostrar que cumplió con el requisito de notificación promulgado por la Sección 204(h) de ERISA, *supra*.

Nótese que, a pesar de que la proyección de la Certificación Actuarial utilizada por el perito de la Cooperativa incluía la modificación o congelación del plan de retiro y la forma en que ésta afectaría al señor Santiago

---

[67] TPO, Apéndice de la Petición de *certiorari*, pág. 500 línea 8 a pág. 501 línea 21.

[68] *Determinación de hecho núm. 49*, Apéndice de la Petición de *certiorari*, pág. 275.

Ortiz, el documento no lo expidió la Cooperativa para el peticionario. Y si el señor Santiago Ortiz hubiese conocido de los cambios implementados antes y después de que la compañía le expidiera el Certificado de participación en el 2010 y previo a su despido, **con el fin de impugnar la cuantía reclamada en las vistas**, **la Cooperativa hubiese provisto tal prueba ante la sala de instancia.** Esto contribuye aún más a nuestra conclusión de que la Cooperativa no pudo rebatir la prueba desfilada por el señor Santiago Ortiz y que el haber tomado en consideración las enmiendas al plan fue la razón para el resultado considerablemente inferior al calculado por el perito del señor Santiago Ortiz.

Con ello en mente, exponemos la metodología utilizada por el perito de la Cooperativa para computar el valor de la pensión. A diferencia del perito del señor Santiago Ortiz, la metodología usada por el experto de la Cooperativa consistió en valorar las partidas de lucro cesante y la pensión en conjunto. Según expuso, el peticionario tuvo una pérdida combinada de lucro cesante y pensión ascendente a $476,630.90 que, al restarle la mesada de $274,501.26,[69] resultó en una pérdida no reembolsada de $202,129.64. Luego de convertida esa cantidad a su valor presente, el perito concluyó que la indemnización debía ser $21,525.33 previo a aplicar la doble

---

[69] Surge de la *Transcripción de la prueba oral* que el perito de la Cooperativa consideró que la mesada que el tribunal de instancia le adjudicó al peticionario constituía un ingreso y no una indemnización. TPO, Apéndice de la Petición de *certiorari*, pág. 638 línea 7 a pág. 646 línea 11.

penalidad que dispone la ley.[70] Este cálculo no es lógico ni técnicamente correcto.[71]

En primer lugar, el experto erróneamente sustrajo la cantidad recibida por concepto de mesada **antes** de calcular el valor presente de la indemnización y previo a fijar la doble penalidad que provee la Ley 100, supra. Según explicamos, la reducción de la mesada es la última operación aritmética que se debe realizar en este tipo de cálculo. En segundo lugar, sin siquiera entrar en lo que correspondía por concepto de pensión, un ejercicio sencillo visual nos lleva a concluir que la diferencia de ingresos entre ambos empleos era de más de $45,000 anuales. Es increíble pensar, como propone el perito de la Cooperativa, que ante esta diferencia abismal salarial la pérdida combinada de lucro cesante y pensión destinada a compensar 25 años de pérdidas totalice $21,525.33.

No albergamos duda de la credibilidad que le mereció al foro de instancia el perito del señor Santiago Ortiz y las cantidades que éste propuso respecto al lucro cesante y a la pensión. Ciertamente, si no intervenimos con la apreciación realizada por el Tribunal de Apelaciones sobre la prueba documental y pericial fracasaríamos como vigilantes de la justicia.

Ahora bien, en ese cuidado, estamos llamados a señalar lo que es correcto. El tribunal de instancia valoró las

---

[70] Véase *Cálculo estimado de lucro cesante & pensión* que preparó el perito de la Cooperativa, Apéndice de la Petición de *certiorari*, pág. 202 y TPO, Apéndice de la Petición de *certiorari*, pág. 623 línea 8 a pág. 629 línea 6.

[71] González Hernández v. González Hernández, supra.

angustias mentales en $65,000 sin identificar un precedente judicial para realizar el ejercicio de valoración de daños.[72] Por tal motivo, el foro apelativo intermedio precisó realizar esa tarea con la cual no intervendremos por considerar que está correcta. Por ello, coincidimos con el tribunal apelativo intermedio de que $35,000 es una cuantía razonable por las angustias mentales sufridas por el peticionario.

Finalmente, el tribunal de instancia impuso y el foro apelativo intermedio confirmó el pago de 15% de la sentencia por concepto de honorarios de abogado conforme a la Ley 100, *supra*. Sin embargo, desde López Vicil v. ITT Intermedia, Inc., 143 DPR 574, 582 (1990) resolvimos "que, de ordinario, la cuantía que podrá recibir el abogado de un trabajador victorioso en una reclamación al amparo de la Ley Núm. 100, *supra*, será el veinticinco por ciento (25%) de la indemnización base concedida al trabajador". Para llegar a ese porcentaje tomamos como punto de referencia el 15% de honorarios de abogado que disponía la Ley 80, *supra*, vigente al momento y **consideramos la complejidad y el costo superior que implica litigar un caso de discrimen bajo la Ley 100, *supra*, comparándolo con un pleito por despido injustificado al amparo de la Ley 80, *supra*.**[73]   El Derecho le asiste. Por lo

---

[72] Véase Rodríguez et al. v. Hospital et al., 186 DPR 889 (2012) reiterado en Santiago Montañez et al. V Fresenius Medical et al.,195 DPR 476 (2016).

[73] López Vicil v. ITT Intermedia, Inc., supra, pág. 582.

tanto, le corresponde al señor Santiago Ortiz el 25% de la sentencia en honorarios de abogado.[74]

Luego de aquilatar toda la prueba y establecer las cantidades debidas y las que no, además del porcentaje correspondiente en honorarios de abogado, nos corresponde implementar la norma pautada relacionada a la ecuación aritmética correcta que los tribunales deben implementar en un caso como el presente. Así, la compensación final del señor Santiago Ortiz será la siguiente:

| CONCEPTO | CANTIDAD |
|---|---|
| Salario dejado de percibir (valor presente) | $538,725.51 |
| Plan de retiro dejado de percibir (valor presente | + $280,841.96 |
| Sub total | $819,567.47 |
| Doble penalidad de la Ley 100 | x 2 |
| Sub total | $1,639,134.94 |
| Angustias mentales ($35,000 x Doble penalidad) | + $70,000.00 |
| Sub total | $1,709,134.94 |
| Mesada por despido injustificado más intereses | -$274,501.26 |
| **Compensación final** | **$1,434,633.68** |

Asimismo, conforme a López Vicil v. ITT Intermedia, Inc., supra, la compensación base es la sumatoria entre

---

[74] La compensación base se refiere a la indemnización antes de imponer la doble penalidad de la Ley 100, supra. López Vicil v. ITT Intermedia, Inc., supra, pág. 582. Debemos puntualizar que en López Vicil v. ITT Intermedia, Inc., supra, establecimos los criterios cuando el abogado entiende que se justifica el recibo de una cuantía mayor en honorarios de abogado. Así, para poder cobrar una tarifa a base de horas trabajadas tendrá que solicitarlo al tribunal mediante un memorando juramentado con detalles de las horas trabajadas y la tarifa que cobrará por hora. El tribunal de instancia tendrá discreción para aceptar o modificar la cuantía reclamada en el memorando, no sin antes fundamentar las razones para determinar la suma concedida. En ese sentido, a menos que exista abuso de discreción, los tribunales revisores no intervendremos con la determinación de instancia. Íd., págs. 583-584. Cabe mencionar que estos criterios los extendimos en Hernández Maldonado v. Taco Maker, 181 DPR 281, 297 (2011) dentro del contexto de la Ley 80, supra.

$819,567.47 y $35,000, por lo que el 25% de $854,567.47 en honorarios de abogado es $213,641.87.


IV

Por los fundamentos antes expuestos, se revoca en parte la *Sentencia* del Tribunal de Apelaciones y así modificada se ordena a la Cooperativa al pago de $1,434,633.68 a favor del señor Santiago Ortiz más $213,641.87 en honorarios de abogado. Se dictará sentencia de conformidad.


                              Erick V. Kolthoff Caraballo
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan José Eugenio Santiago Ortiz

    Peticionario

        v.                    CC-2019-674      Certiorari

Real Legacy Assurance Company,
Inc.; Cooperativa de Seguros
Múltiples de Puerto Rico;
Compañía de Seguro YZX

    Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 4 de febrero de 2021.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se revoca en parte la *Sentencia* del Tribunal de Apelaciones y así modificada se ordena a la Cooperativa al pago de $1,434,633.68 a favor del Sr. Juan José Eugenio Santiago Ortiz más $213,641.87 en honorarios de abogado.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emite Opinión Concurrente. La Jueza Presidenta Oronoz Rodríguez concurre y hace constar la expresión siguiente a la cual se une el Juez Asociado señor Colón Pérez:

> Una Mayoría de este Tribunal se extralimita en su facultad adjudicativa al resolver asuntos que: (1) no se trajeron ante nuestra consideración, y (2) estaban excluidos de nuestra revisión judicial. El Pleno de este Tribunal expidió para resolver **únicamente** cuál es la fórmula correcta para deducir la mesada que se concedió al amparo de la Ley 80 de 30 de mayo de 1976, de la compensación que se

otorgó bajo la Ley Núm. 100 de 30 de junio de 1959. En el momento en que expedimos decidimos que no evaluaríamos las cuantías que concedió el Tribunal de Apelaciones. De hecho, limitamos nuestra función revisora al primer señalamiento de error y así lo hicimos constar en la Resolución que emitimos el    6 de diciembre de 2019. Fue a base de esa directriz que las partes elaboraron sus alegatos. En consecuencia, la parte recurrida argumentó únicamente el primer señalamiento de error y reiteró que, como este Tribunal expidió sólo en cuanto a la controversia sobre la fórmula aritmética para imputar la doble penalidad de la Ley Núm. 100, supra, no debíamos considerar los argumentos del peticionario sobre partida específica alguna.

La Opinión de hoy adjudica un asunto medular que afecta las partidas que se le concederán al peticionario, sin que se les diera oportunidad a las partes para argumentar sobre su corrección. El derecho a ser oído es fundamental al debido proceso de ley. Si luego de evaluar el expediente entendíamos que era meritorio revisar las cuantías en controversia, debimos concederles a las partes un término para que se expresaran sobre ese aspecto puntual. Nótese que la parte recurrida no se defendió de varias alegaciones en su contra, ni tenía que hacerlo, pues descansó en nuestra determinación de que no atenderíamos otros argumentos. Por lo tanto, no nos correspondía entrar en ellos. Si bien estoy de acuerdo con la fórmula aritmética con la que este Tribunal computa la doble penalidad de la Ley Núm. 100, supra, por los fundamentos anteriores no puedo estar conforme con la Opinión. Por ello, respetuosamente concurro.

El Juez Asociado señor Colón Pérez concurre con el resultado sin opinión escrita.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

| | | |
|---|---|---|
| José Eugenio Santiago Ortiz<br><br>Recurrido<br><br>v.<br><br>Real Legacy Assurance Company Inc.; Cooperativa de Seguros Múltiples de Puerto Rico; Compañía de Seguro YZX<br><br>Peticionarios | CC-2019-0674 | *Certiorari* |

**Opinión concurrente emitida por el Juez Asociado señor Rivera García**

En San Juan, Puerto Rico, a 4 de febrero de 2021.

La determinación que emite hoy una Mayoría de este Tribunal resuelve cuál debe ser la ecuación aritmética correcta al deducir la mesada que regula la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley de indemnización por despido sin justa causa*, 29 LPRA sec. 185a *et seq.* (Ley Núm. 80) de la compensación recibida por un empleado en un litigio que también acumula una reclamación al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la *Ley contra el discrimen de empleo*, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100). En la aplicación de esta operación matemática estoy conteste con la Opinión Mayoritaria.

Sin embargo, el pronunciamiento que realiza este Tribunal al atender un señalamiento de error que no fue cometido por el Tribunal de Apelaciones ni planteado ante este Tribunal hace imperativo emitir algunas expresiones sobre aquellos aspectos que me impiden suscribir la

totalidad del raciocinio esbozado en la Opinión Mayoritaria. Esta no es la norma que surge diáfanamente de los casos que ha atendido este Tribunal, como asegura la Opinión Mayoritaria. Por ello, concurro con la Opinión que hoy emite una Mayoría de este Tribunal.

I

Debido a que los elementos fácticos están detallados en la Opinión Mayoritaria, nos limitaremos a esbozar el tracto procesal relevante a la razón por la que me veo precisado a concurrir.

Una vez el Tribunal de Primera Instancia declaró con lugar la reclamación por la Ley Núm. 80 y la Ley Núm. 100 presentada en contra de Real Legacy Assurance Company, Inc. (Real Legacy) y la Cooperativa de Seguros Múltiples de Puerto Rico (Cooperativa) por el Sr. Juan José Eugenio Santiago (peticionario), procedió a realizar un cálculo aritmético para determinar la compensación a la que tenía derecho el peticionario. No obstante, tal como surge de la Opinión de la Mayoría, al efectuar ese cálculo, el Tribunal de Primera Instancia incurrió en un error al restar los pagos que la Cooperativa hizo al peticionario por concepto de liquidación de vacaciones ($18,000), plan de retiro (401K) ($70,000) y el pago retroactivo del plan de retiro de la pensión prematura recibida por el peticionario ($12,000) de la indemnización otorgada al peticionario.

En desacuerdo, la Cooperativa recurrió ante el Tribunal de Apelaciones para cuestionar la apreciación de la prueba, la adjudicación de los hechos y la aplicación del derecho que realizó en su determinación el foro primario. Así, **el Tribunal de Apelaciones emitió una Sentencia en la que modificó las cuantías de las sumas concedidas por el foro primario y confirmó en parte el dictamen recurrido.** En cuanto al presunto error sobre la resta de las cuantías mencionadas que cometió el Tribunal de Primera Instancia, la Opinión Mayoritaria dispone que **"a pesar de que el Tribunal de Apelaciones implementó erróneamente el cálculo matemático discutido, <u>sí actuó correctamente al no restar las partidas de liquidación por vacaciones, el pago de pensión prematura ni el plan de ahorro que retiró el peticionario</u>".** (Énfasis suplido).[75] De esta forma, **la Opinión Mayoritaria reconoce que el Tribunal de Apelaciones no cometió el erró de restar las partidas mencionadas, sino que, por el contrario, corrigió esa parte de la ecuación errónea realizada por el foro primario.**

A pesar de lo anterior, una Mayoría de este Tribunal entiende necesario disponer y discutir si esas partidas  -que, como mencionamos, no son un error de la determinación tomada por el Tribunal de Apelaciones- constituyen o no una remuneración por trabajo obtenido y

---

[75] Véase Opinión Mayoritaria pág. 23.

realizado. Esto es, si constituyen una compensación que deba ser deducida de la ecuación aritmética que deberán llevar a cabo los tribunales cuando atiendan casos como el presente, en los que se acumulen reclamaciones al amparo de la Ley Núm. 80 y la Ley Núm. 100.

Ante este marco fáctico, procedemos a exponer el derecho pertinente para fundamentar el motivo por el cual discrepamos del dictamen Mayoritario.

**II**

**A.**

La doctrina jurídica de justiciabilidad se define como una limitación impuesta por los tribunales antes de llevar a cabo la revisión judicial y evaluar los méritos de una controversia legal.[76] En síntesis, es una doctrina autoimpuesta por el tribunal, mediante la cual el foro judicial se abstiene de considerar asuntos traídos ante su consideración qu (1) no estén adecuadamente concretizados por partes adversas que litiguen celosamente su caso e informen adecuadamente al tribunal y (2) que atenten contra el principio de la separación de poderes.[77] De ella emanan doctrinas particularizadas, como lo son las figuras legales de la legitimación activa, la academicidad, la madurez y **la prohibición** de considerar cuestiones políticas o **emitir opiniones**

---

[76] Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 931-932 (2011); Suárez v. CEE III, 163 DPR 400, 406 (2004); Comisión Asuntos de la Mujer v. Srio. de Justicia, 109 DPR 715, 720-721 (1980).

[77] Íd.

**consultivas** o entre partes en colusión.[78] Más bien, la aplicabilidad de determinada doctrina de justiciabilidad descansará en el criterio del tribunal, el cual estará informado por los siguientes factores:

> (1) [si la controversia presentada ante el foro judicial es] tan definida y concreta que afecte las relaciones jurídicas entre las partes que tienen un interés jurídico antagónico; (2) que el interés sea real y substancial y que permita un remedio específico mediante una sentencia de carácter concluyente, y finalmente (3) si la controversia es propia para una determinación judicial, ya que se distingue de una disputa de carácter hipotético o abstracto, y de un caso académico o ficticio.[79]

En ese sentido, hemos definido anteriormente la **opinión consultiva** "como la ponencia legal emitida por un tribunal cuando no tiene ante su consideración un caso o una controversia justiciable y cuyo resultado, por lo tanto, no es obligatorio".[80] A su vez, la doctrina de la opinión consultiva "intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa, ya que no es función de los tribunales actuar como asesores o

---

[78] Bhatia Gautier v. Gobernador, 199 DPR 59, 68-69 (2017); Asoc. Fotoperiodistas v. Rivera Schatz, *supra*, 932; UPR v. Laborde Torres y otros I, 180 DPR 253, 280 (2010).

[79] SLG Szendrey-Ramos v. Consejo de Titulares, 184 DPR 133, 150 (2011); Asoc. Fotoperiodistas v. Rivera Schatz, *supra*.

[80] Asoc. Alcaldes v. Contralor, 176 DPR 150, 158 (2009); Ortiz v. FEI, 155 DPR 219, 251-251 (2001).

consejeros".[81] Por ello, es una autorestricción que se fundamenta en lo siguiente:

> (1) [l]a posibilidad en que el Tribunal incurra en error por ausencia de hechos concretos que le permitan entender cabalmente lo que está en juego o porque la ausencia de las partes adversarias impida que las cuestiones se presenten adecuadamente; y, (2) una necesidad de que los tribunales se protejan como institución.[82]

Cónsono con lo anterior, este Tribunal debe prevenir la intervención en controversias que no tengan implicaciones reales entre las partes, pues los tribunales tienen el deber de adjudicar controversias genuinas y vivas.[83]

Claramente, la ausencia de los criterios de autolimitación judicial implicaría que los tribunales estarían desbordados de controversias abstractas fundamentadas en situaciones hipotéticas.

### B.

Como norma general, los foros revisores no debemos intervenir con las determinaciones de hecho realizadas por el foro primario, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto.[84] La seguridad

---

[81] Asoc. Alcaldes v. Contralor, *supra*. Véase J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos,* Bogotá, Ed. Temis, 2009, pág. 98.

[82] Álvarez González, *op. cit.*, págs. 97-98.

[83] ELA v. Aguayo, 80 DPR 552, 584 (1958).

[84] Pueblo v. Toro Martínez, 200 DPR 834, 858-859 (2018); SLG Torres – Matundan v. Centro Patología, 193 DPR 920, 933 (2015); Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013).

y confianza que merecen las determinaciones de los compañeros de la Judicatura no permite el uso desmedido de esta prerrogativa ni la intromisión indebida del foro revisor.[85]

Ahora bien, hemos señalado que la norma de la deferencia judicial tiene límites y no supone inmunidad absoluta frente a la función de los tribunales revisores.[86] Como foro revisor hemos expresado que tenemos la responsabilidad de velar porque se haga justicia a "aquella parte que de acuerdo [con] nuestro más sano criterio tiene derecho a ella".[87] En ese sentido, hemos razonado que, "cuando el derecho le asiste a una parte, este Tribunal puede atender señalamientos de error que no fueron argumentados".[88] Asimismo, como foro apelativo tenemos la "facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes".[89]

_____

[85] E. Rivera García, *Los criterios de revisión judicial y su aplicación en el sistema acusatorio* en *Compendio sobre el sistema acusatorio: Experiencias compartidas*, San Juan, Publicaciones Gaviotas, 2019, pág. 341.

[86] Dávila Nieves v. Meléndez Marín, *supra*, págs. 771-772.

[87] López Vicil v. ITT Intermedia, Inc., 142 DPR 857, 867 (1997), citando Ríos Quiñones v. Adm. Servs. Agrícolas, 140 DPR 868, 871 (1996). Véase López Vicil v. ITT Intermedia, Inc.,143 DPR 574 (1997).

[88] Íd.

[89] Vilanova et al. v. Vilanova et al., 184 DPR 824, 848 (2012).

Al considerar los principios inherentes del sistema judicial, no se deben pasar por alto los criterios de revisión judicial que hemos pautado. Así, entre los estándares primordiales para el ejercicio de la función judicial apelativa, se encuentra el estándar del fracaso a la justicia que no debe ser utilizado livianamente.[90]

Con este marco jurídico en mente, procedemos a discutir las implicaciones de atender y resolver sin fundamento una controversia que no fue presentada ante nuestra consideración.

### III

En este caso, una Mayoría de este Tribunal acoge una postura que altera la equidad procesal que rige nuestro sistema apelativo y que es un principio cardinal en nuestro sistema adversarial.

La Opinión Mayoritaria fundamenta la necesidad de atender la controversia a la que hemos hecho referencia en que una legislación llamada a favorecer al empleado

---

[90] Al evaluar un fracaso a la justicia como foro apelativo sobre un error que no fue planteado ante el foro primario y se presenta en un recurso ante este Tribunal, podemos considerar los siguientes criterios:

En primer lugar, deberá tratarse de un escenario en el cual no hay duda que el error fue cometido, es decir, que se trate de una falta crasa. En segundo lugar, el error debe ser sustancial en cuanto a su efecto en el resultado del caso, ya que si no se hubiese cometido el resultado evidentemente hubiera sido otro. En otros términos, debe tratarse de un error claramente perjudicial. En tercer lugar, y más importante aún, el juzgador debe estar convencido de que no corregir la falta cometida entrañaría un fracaso a la justicia. Rivera García, *op. cit.*, pág. 339.

no puede convertirse en un privilegio para el patrono. Por ello, decide entender en una controversia que realmente no se encuentra ante la consideración de este Foro por no ser parte de la sentencia recurrida y, por consiguiente, tampoco aducida en los señalamientos de error presentados ante este Tribunal. En consecuencia, me veo en la obligación de cuestionar si nos encontramos ante un caso en el cual sea necesario aplicar la excepción de intervenir con errores cometidos por los foros revisados aun cuando no hayan sido argumentados por las partes. Dicha excepción está fundamentada en el hecho de que, "[c]omo foro revisor, existe la 'obligación de velar porque se haga justicia a aquella parte que de acuerdo [con] nuestro más sano criterio tiene derecho a ella'".[91] Como explicaremos más adelante, la referida excepción solo tiene cabida cuando, contrario a lo ocurrido en este caso, existe un error que debemos corregir.

Es importante resaltar que, contrario a lo resuelto por esta Curia en <u>López Vicil v. ITT Intermedia Inc.</u>,[92]

---

[91] Véase Opinión Mayoritaria, pág. 20.

[92] En <u>López Vicil v. ITT Intermedia Inc.</u>, 142 DPR 857 (1997), el Tribunal de Primera Instancia falló a favor del Sr. Héctor López Vicil como empleado y determinó que su patrono, ITT Intermedia, Inc. incurrió en un despido discriminatorio. Por ello, concedió un total de $616,473 ——compuesto por $416,473 por pérdida de ingresos y beneficios ocupacionales pasados y futuros; $100,000 por angustias mentales y $100,000 por daños mentales——, que en virtud de la penalidad impuesta por la Ley Núm. 100 se convirtió en $1,234,946 y $515,000 en honorarios de abogado. Por su parte, el Tribunal de Apelaciones revocó el dictamen del foro primario por considerar que sólo se probó la causa de acción de despido injustificado concediendo únicamente el remedio dispuesto en la Ley Núm. 80 ——otorgando exclusivamente una compensación para el empleado

142 DPR 857 (1997), no nos encontramos ante un caso en el que este Tribunal, en el ejercicio de su discreción, debía intervenir con lo resuelto por el Tribunal de Apelaciones en aras de evitar un fracaso a la justicia. Como bien se expresa en la Opinión Mayoritaria, **el foro apelativo intermedio corrigió el error cometido por el foro primario**. Es decir, la controversia que decidió resolver este Tribunal, a los efectos de aclarar que en nuestra jurisdicción las partidas de liquidación por vacaciones, plan de retiro (401K) y el pago de pensión prematura no constituyen una remuneración por trabajo obtenido y realizado luego del despido y, por consiguiente, que no deben ser deducidas de las partidas pertinentes en reclamaciones de Ley Núm. 80 y Ley Núm. 100, no era una controversia que se encontraba ante la atención de este Tribunal, lo que torna esa parte de la Opinión en una opinión consultiva.

No podemos olvidar que nuestro sistema judicial tiene el deber ministerial de mantener absoluta

_____

de $28,448.74—, sin honorarios de abogado. Inconforme, el señor López Vicil recurrió ante esta Curia. Este Tribunal concluyó, contrario al foro apelativo intermedio, que se logró probar un despido discriminatorio. Ante ello, procedió a revisar los remedios concedidos por el Tribunal de Primera Instancia. Específicamente, evaluó y corrigió las cuantías otorgadas por el referido foro en concepto de angustias y daños mentales, así como los honorarios de abogado.

**De lo anterior se puede colegir que, en contraste con la Opinión Mayoritaria ——en donde queda claro que el Tribunal de Apelaciones subsanó el error cometido por el tribunal de instancia al que hacemos referencia—— en** López Vicil v. ITT Intermedia Inc., *supra*, **de este Tribunal no haber intervenido, el error cometido por el foro primario hubiera permanecido. Por tanto, en el presente caso, la intervención de este Tribunal para corregir el error del Tribunal de Primera Instancia resultaba innecesaria.**

imparcialidad. Ello implica que el ejercicio de ese importante deber ministerial no debe quedar a nuestro arbitrio y completa discreción, sino que debe estar sujeto a unos criterios específicos y uniformes de autolimitación en la labor judicial que se ajusten a lo planteado por las partes y los errores incurridos por los foros revisados. Además, es harto conocido que la discreción está estrechamente ligada al concepto de razonabilidad. Por ello, no puedo avalar que este Tribunal busque la manera de emitir una opinión consultiva como lo hace la Opinión Mayoritaria en la parte que hemos señalado. Esto, porque la consecuencia inmediata sería tener que atender una gran cantidad de casos presentados con la expectativa de obtener un resultado como este.

Contrario a lo ocurrido en el caso ante nuestra consideración, aclaramos que, un requisito para poder intervenir en la esfera apelativa es que el asunto o controversia sea planteado por las partes ante los foros revisores. Ciertamente, hemos reconocido que ésta no es una norma absoluta, ya que "un tribunal apelativo tiene la facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes".[93] No obstante, como sabemos, esto es un criterio que surge como un

---

[93] Vilanova et al. v. Vilanova et al., *supra*.

método supletorio cuando la justicia exige la intervención del Poder Judicial. Más bien, es una excepción a la norma que limita su aplicación al enfrentarnos a lo que hemos denominado un fracaso a la justicia. De lo contrario, con nuestras actuaciones, nos convertimos en un foro consultivo al adjudicar controversias que no han sido defendidas vigorosamente por las partes. En el presente caso no se configura un fracaso a la justicia, más aún cuando el foro apelativo intermedio subsanó el error del tribunal primario.

Debido a que la Opinión que hoy emite una Mayoría de este Tribunal atiende y pauta una norma de derecho sobre un asunto que no está ante nuestra consideración sin fundamentos que puedan justificar la intervención de manera excepcional, me veo precisado a concurrir con el dictamen.[94]

Edgardo Rivera García
Juez Asociado

---

[94] Evidentemente, la Opinión Mayoritaria crea un precedente que trastoca el principio de absoluta imparcialidad y, a su vez, incide en la equidad procesal en nuestro sistema adversativo.